Argued and submitted June 7, 2012, reversed and remanded January 2, 2014

STATE OF OREGON
and City of Portland,
*Plaintiffs-Respondents,*

*v.*

SHARITA J. MARTIN,
*Defendant-Appellant.*

Multnomah County Circuit Court
100342526; A145850

317 P3d 408

Kali Montague, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Harry Auerbach, Chief Deputy City Attorney, argued the cause and filed the brief for respondent City of Portland.

Timothy A. Sylwester, Assistant Attorney General, waived appearance for respondent State of Oregon.

Before Duncan, Presiding Judge, and Haselton, Chief Judge, and Brewer, Judge pro tempore.

DUNCAN, P. J.

**DUNCAN, P. J.**

In this criminal case, defendant appeals the trial court's judgment convicting her of unlawful prostitution procurement activity (UPPA), Portland City Code (PCC) 14A.40.050. Defendant assigns error to the trial court's denial of her motion to suppress evidence that a police officer obtained after he stopped and arrested her for UPPA and attempted prostitution, ORS 167.007 and ORS 161.405. On appeal, defendant argues, as she did in the trial court, that the evidence is inadmissible because it was obtained as a result of a violation of her right, under Article I, section 9, of the Oregon Constitution, to be free from unreasonable searches and seizures.[1] Specifically, defendant argues that the evidence is inadmissible because it was obtained as a result of the stop—which, she contends, violated Article I, section 9, because it was not supported by reasonable suspicion—and the arrest—which, she contends, violated Article I, section 9, because it was not supported by probable cause. Because all of the evidence that defendant sought to suppress was discovered after the arrest, the dispositive question is whether the arrest violated Article I, section 9. For the reasons explained below, we conclude that it did. Therefore, the trial court erred in denying defendant's motion to suppress, and we reverse and remand.

We review a trial court's denial of a defendant's motion to suppress evidence for errors of law. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). When we do so, we are bound by the trial court's express and implicit findings of fact if there is constitutionally sufficient evidence in the record to support them. *Id*. We state the facts in accordance with those standards.

On the evening of March 8, 2010, two Portland police officers spoke with defendant on 82nd Avenue, a high-vice area, and subsequently asked Officer Kula to monitor her. Kula was a member of the Prostitution Coordination Team, and his full-time assignment was, as it had been for

---

[1] Article I, section 9, of the Oregon Constitution provides, in relevant part: "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

the preceding three years, to patrol 82nd Avenue for prostitution activities. Kula did not know or recognize defendant.

Driving an unmarked police car, Kula followed defendant from approximately 9:45 p.m. to 10:50 p.m., as she walked on the sidewalk along 82nd Avenue. Defendant wore a puffy jacket, an above-the-knee skirt, and heeled boots.

When Kula began following her, defendant was walking along the east side of 82nd Avenue. She was headed north, the same direction as the traffic in the lanes next to her. She repeatedly looked over her left shoulder at the traffic. She did not speak or gesture to any pedestrians or motorists.

After walking approximately 25 to 26 blocks, defendant approached the intersection of 82nd Avenue and Northeast Schuyler Street. A Toyota Tundra pickup truck was idling on the north side of Schuyler Street, 30 to 40 feet east of 82nd Avenue. Defendant looked at the Tundra, but did not approach it. After defendant crossed Schuyler Street, the Tundra driver pulled out and turned north onto 82nd Avenue. He passed defendant, traveled one block, and then turned east onto Northeast Hancock Street.

Defendant did not turn east onto Hancock Street. She continued walking along 82nd Avenue toward the next cross street, Northeast Tillamook Street.

There is a Plaid Pantry at the northeast corner of the intersection of 82nd Avenue and Tillamook Street. As defendant approached the intersection, the Tundra came down Tillamook toward 82nd Avenue and pulled into a parking spot in the Plaid Pantry parking lot. Defendant crossed Tillamook, while watching the Tundra. She did not approach the Tundra; she kept walking on the sidewalk. After passing the first of two driveways into the Plaid Pantry parking lot, defendant stopped in the second driveway, turned toward the Tundra, and paused. While still standing in the second driveway, defendant adjusted her boot. The Tundra driver backed out of the parking spot and drove toward the second driveway, but stopped approximately 15 feet away from defendant. At that point, Kula, who was observing

from a side street a few blocks away, pulled out onto 82nd Avenue and drove toward the Plaid Pantry so he could "see what [defendant] was doing, if she was going to get into the [Tundra]."

Kula saw defendant take one or two steps into the parking lot toward the Tundra, look over her shoulder at his unmarked police car, stop, and return to the sidewalk. Kula testified, "[I]t was my sense that she knew I was watching at that point." According to Kula, defendant took "maybe just a step or two *** into the parking lot, but then was right back on the sidewalk and walking northbound."

After defendant crossed the second driveway and walked approximately 50 feet north on 82nd Avenue, the Tundra driver pulled out onto 82nd Avenue and headed north. Kula followed the Tundra to run a records check and to see if the driver would turn back toward defendant. The Tundra was not registered to anyone Kula recognized as being involved in prostitution and, after following it for three or four minutes, Kula concluded that the driver was not going to turn back toward defendant.

Kula made a U-turn and headed south on 82nd Avenue to find defendant. Defendant had changed direction and was walking south on the same sidewalk along 82nd Avenue. Kula, who had received defendant's name from the two officers who had spoken with her earlier, checked defendant's criminal records. The records indicated that defendant had seven or eight arrests for prostitution-related crimes between 2004 and 2006. The records did not show any arrests or convictions for prostitution-related crimes in the four years since that time.

Defendant continued to walk south for at least 30 blocks. She then crossed to the west side of 82nd Avenue and walked one block south to a bus stop at Southeast Yamhill Street, where she spoke with a woman, whom Kula knew to be a prostitute, for approximately 30 to 45 seconds. At that point, Kula concluded that defendant was not going to get into a car, and he decided to stop and talk to her.

After speaking with the woman at the bus stop, defendant crossed back to the east side of 82nd Avenue

and started to walk north again. Kula got out of his car, approached defendant, and asked if she would speak with him. Defendant responded, "Why?" and continued walking. Kula ordered her to stop and talk to him, and she did so. Kula asked to see her identification, and defendant asked why he wanted it. He replied that he suspected her of attempting to commit prostitution. Defendant refused to provide identification and denied being a prostitute. Kula asked defendant for her identification again, and she refused again. Kula believed that he had probable cause to arrest defendant for UPPA and attempted prostitution, so he told her that she was under arrest and handcuffed her. After giving her the *Miranda* warnings, Kula searched defendant's purse and found incriminating items. Defendant subsequently made inculpatory statements to Kula.

As mentioned, defendant was charged with UPPA in violation of PCC 14A.40.050 and attempted prostitution in violation of ORS 167.007 and ORS 161.405. Before trial, defendant filed a motion seeking to suppress all evidence Kula discovered as a result of the stop and arrest, including physical evidence and statements. At the hearing on the motion, defendant argued that, because the evidence was obtained as a result of an unlawful stop and arrest, it violated Article I, section 9, of the Oregon Constitution. The state responded that, under the totality of the circumstances, Kula had reasonable suspicion to stop and probable cause to arrest defendant for UPPA and attempted prostitution.

At the hearing, Kula testified about the typical behavior of women working as prostitutes on 82nd Avenue, explaining that they will walk along the avenue and attempt to make eye contact with male drivers; if a man signals that he is interested, the woman will acknowledge his response, and the man will turn onto a side street, circle back, and park near the avenue, where the woman will get into his car "as quickly as possible" to avoid detection by law enforcement officers.

Regarding defendant in particular, Kula testified that defendant had looked over her shoulder as she walked and that she had paid attention to the movement of vehicles around her, particularly those that turned off of 82nd

Avenue in front of her. Kula testified that he had followed defendant for an hour and five minutes, during which time she was only out of his sight for the three to four minutes when he followed the Tundra. Kula did not see defendant contact or attempt to stop any motorists, but he believed that her behavior was "consistent with" prostitution activity. He testified, "Just coming out [to 82nd Avenue] and acting in a manner that [defendant] did, in my mind is a substantial step towards the act of prostitution[.]" He explained that, at the time he stopped defendant, he believed—based on her conduct and arrest history—that it was more likely than not that she had been attempting to commit prostitution.

After the presentation of evidence, the parties and the trial court discussed cases involving stops and arrests for prostitution activities, including *State v. Brown*, 31 Or App 501, 570 P2d 1001 (1977). In *Brown*, two police officers saw the defendant, whom they did not recognize, walking in a high-vice area and "told her to get off of the streets as they did not want prostitutes walking in that vicinity." *Id.* at 503. Forty-five minutes later, the officers returned to the area and saw the defendant cross the street and talk to a known prostitute. The officers stopped the defendant because they suspected her of loitering to solicit prostitution, as prohibited by the Portland City Code. *Id.* at 507. The state argued that the officers also had reasonable suspicion to stop the defendant for attempted prostitution.

On appeal, we held that the officers lacked reasonable suspicion to stop the defendant. With respect to attempted prostitution, we explained:

> "Nothing in the conduct of the defendant could be classified as a substantial step toward commission of an act of prostitution. She was walking in an area of high vice activity and was seen talking to a known prostitute. There was nothing in these activities to suggest she was attempting to offer or to agree to engage in sexual conduct."

*Id.* With respect to loitering to solicit prostitution, we stated:

> "While the police officers may have had a reasonable suspicion the defendant was loitering because she was seen in the area on two occasions, there was nothing in her activities which manifested a purpose to solicit for prostitution.

> Shorn of the police officer's intuition borne of experience, the articulable objective facts are the defendant was twice seen walking in an area of high prostitution activity and talking to a known prostitute on one occasion. The officers stated they did not observe her talking to male passersby or hailing or attempting to stop vehicles. The officers testified they did not know if the defendant left the area when ordered to do so or what she was doing in the interval between the first and second confrontation. There was no indication from her conduct what her purpose was in being on the street."

*Id.* at 508.

After discussing *Brown*, the parties and the court focused on whether Kula had reasonable suspicion and probable cause to believe that defendant had the intent to engage in prostitution.[2] The trial court pointed out that defendant "didn't actually talk to anybody, didn't get into the car, didn't do anything more overt than looking over her shoulder and walking[.]" The trial court also pointed out that it was defendant's intent, not the intent of the driver of the Tundra, that mattered. The court stated, "[I]t may well be that the driver of the Tundra was engaged in UPPA * * * [b]ut it's not the opinion of the driver of the Tundra about the defendant [that] we're concerned with."

Defense counsel argued that defendant's act of looking over her shoulder was not suspicious, contending, *inter alia*, that "criminal activity does happen on 82nd Avenue and a young woman walking alone at night should darn well be aware of her circumstances." The prosecutor responded that defendant not only looked over her shoulder, she also walked with no apparent purpose, stepped toward the Tundra, and spoke to a woman whom Kula knew worked as a prostitute.

The trial court denied defendant's motion, holding that, given defendant's location and conduct, Kula had reasonable suspicion to stop her and probable cause to arrest her. The court observed, "[T]he configuration of evidence in this case is just as close to the margin as I can recall," and

---

[2] In the trial court, defense counsel argued that, even if Kula had probable cause to arrest defendant, Kula's search of defendant's purse was not a valid search incident to arrest. Defendant does not renew that argument on appeal.

stated that, if the case were appealed, "I can well imagine it coming in the other direction."

The trial court dismissed the attempted prostitution count after the state elected not to pursue it. Defendant waived her right to a jury trial and proceeded to a bench trial on the UPPA count. The trial court convicted defendant, and this appeal followed.[3]

On appeal, defendant renews the arguments that she made in the trial court, contending that Kula violated her rights under Article I, section 9, because he stopped her without reasonable suspicion and arrested her without probable cause. Article I, section 9, protects individuals against unreasonable searches and seizures. Seizures include stops, which are "temporary restraint[s] on a person's liberty," and arrests, which are "restraints on an individual's liberty that are steps toward charging individuals with a crime * * *." *State v. Ashbaugh*, 349 Or 297, 308-09, 244 P3d 360 (2010). To be reasonable under Article I, section 9, a stop must be based on reasonable suspicion and an arrest must be based on probable cause. *Id.* at 309.

An officer has reasonable suspicion to stop a person when the officer has an objectively reasonable belief, based on specific and articulable facts, that the person has committed or is about to commit a crime. *Ehly*, 317 Or at 80; *State v. Alvarado*, 257 Or App 612, 626, 307 P3d 540 (2013); *State v. Mitchele*, 240 Or App 86, 91, 251 P3d 760 (2010). The officer's suspicion must be particularized to the person and based on the person's conduct. *State v. Miglavs*, 337 Or 1, 12, 90 P3d 607 (2004); *State v. Kingsmith*, 256 Or App 762, 769, 302 P3d 471 (2013).

"The fact that there might be innocent explanations for conduct does not mean that the conduct cannot also give rise to reasonable suspicion of criminality." *State v. Villemeyer*, 227 Or App 193, 198, 205 P3d 49 (2009) (internal quotation marks omitted). But, an officer may not stop a person simply because the person's conduct is consistent

---

[3] Although both the city and state are respondents on appeal, only the city filed a brief. After the city filed its brief, the state waived further appearance, noting that the city had filed its brief and the appeal concerns only defendant's conviction for an offense under the city's code.

with criminal conduct; the nature of the conduct matters. As we explained in *Alvarado,* where the state argued that a drug-trafficking stop was supported, in part, by evidence that "(1) the car defendant was driving was owned by somebody else; (2) defendant was carrying a cell phone and a pager; and (3) the car contained multiple air fresheners and two bottles of cologne[,]"

> "a set of facts will not always create a reasonable suspicion just because those facts are consistent with, but do not necessarily suggest, a crime being committed. Wearing clothing while driving, to use an extreme example, is also consistent with the transportation of narcotics. Less extremely, so too (for all we know) is wearing cologne. This consistency, however, would not be enough to support reasonable suspicion."

257 Or App at 629. *See State v. Maciel,* 254 Or App 530, 539, 295 P3d 145 (2013) (notwithstanding officer's testimony that people engaged in criminal enterprises often use prepaid cellular phones, the presence of two prepaid cellular phones carried little weight because such phones can be easily lawfully acquired by criminals and noncriminals alike).

When evaluating the objective reasonableness of an officer's suspicion, a court considers the totality of the circumstances, viewed in light of the officer's experience. *Alvarado,* 257 Or App at 631; *State v. Berry,* 232 Or App 612, 617, 222 P3d 758 (2009), *rev dismissed,* 348 Or 71 (2010). The officer's experience is relevant to what inferences the officer may draw from the circumstances. *Alvarado,* 257 Or App at 631; *Maciel,* 254 Or App at 535. But, an officer's experience cannot form the entire basis for reasonable suspicion. *State v. Valdez,* 277 Or 621, 628, 561 P2d 1006 (1977); *State v. Ellis,* 252 Or App 382, 388, 287 P3d 1215 (2012), *rev den,* 353 Or 428 (2013). "Intuition or instinct, even of an experienced officer, cannot amount to reasonable suspicion of criminal activity[.]" *State v. Houghton,* 91 Or App 71, 75, 754 P2d 13 (1988) (citing *Valdez,* 277 Or at 628); *see also State v. Paro,* 192 Vt 619, 623, 54 A3d 516 (2012) ("We recognize that police officers are trained to be suspicious and it is their job to investigate suspicious situations. But we must also be mindful of our right to wander where we please, when we please, without fear of a police seizure.").

The reasonable suspicion standard is "less demanding than that for probable cause to arrest * * *." *State v. Turner*, 221 Or App 621, 626 n 4, 191 P3d 697 (2008). An officer has probable cause to arrest a person only when the officer has a substantial objective basis for believing that, more likely than not, an offense has been committed and the person to be arrested has committed it. *State v. Owens*, 302 Or 196, 204, 729 P2d 524 (1986); *State v. Hudson*, 253 Or App 327, 341, 290 P3d 868 (2012), *rev den*, 353 Or 562 (2013); *see also State v. Verdine*, 290 Or 553, 557, 624 P2d 580 (1981) ("[S]uspicion, no matter how well founded, does not rise to the level of probable cause [to arrest].").

As with reasonable suspicion, whether an officer has probable cause to arrest a person depends on the totality of circumstances known to the officer at the time of the arrest, viewed in light of the officer's experience. *State v. Heckathorne*, 347 Or 474, 484-85, 223 P3d 1034 (2009). But, also as with reasonable suspicion, an officer's experience cannot form the entire basis for probable cause. And, although an officer is not required to eliminate all possible lawful explanations for a person's conduct before arresting the person, it must be more likely than not that the unlawful explanation is the actual explanation. *State v. Foster*, 350 Or 161, 173, 252 P3d 292 (2011).

Here, Kula stopped and arrested defendant because he believed that she had violated PCC 14A.40.050 and ORS 167.007. PCC 14A.40.050, which defines the crime of UPPA, provides:

"A. As used in this Section, 'prostitution' means that unlawful conduct defined in Section 14A.40.040 of this Code.[4] As used in this Section, 'prostitution procurement activity' means any conduct by any person that constitutes a substantial step in furtherance of an act of prostitution. Such activity includes, but is not limited to, lingering in or near any street or public place, repeatedly circling an area in a motor vehicle, or repeatedly beckoning to, contacting, or attempting to stop pedestrians or motor vehicle operators.

---

[4] PCC 14A.40.040 defines "prostitution" as "engaging in, offering, or agreeing to engage in sexual conduct or sexual contact for a fee or paying, offering, or agreeing to pay a fee to engage in sexual conduct or sexual contact."

"B. It is unlawful for any person to engage in any prostitution procurement activity with an intent to induce, entice, solicit, procure, locate, or contact another person to commit an act of prostitution."

ORS 167.007(1), which defines the crime of prostitution, provides, in pertinent part:

"A person commits the crime of prostitution if the person engages in, or offers or agrees to engage in, sexual conduct or sexual contact in return for a fee."

ORS 161.405(1), which defines attempt, provides, in pertinent part:

"A person is guilty of an attempt to commit a crime when the person intentionally engages in conduct which constitutes a substantial step toward commission of the crime."

We have explained that "[t]here is no meaningful distinction between the crime of unlawful prostitution procurement activities and attempted prostitution." *State v. Nelson*, 218 Or App 563, 566, 180 P3d 133 (2008).

As mentioned, defendant argues that Kula lacked reasonable suspicion to stop her and probable cause to arrest her. However, as the parties acknowledged at oral argument, because Kula did not discover any evidence in the brief period of time between the stop and the arrest, the dispositive question is whether Kula had probable cause to arrest defendant. Stated more precisely, the question is whether Kula had a substantial objective basis for believing that, more likely than not, defendant had engaged in conduct constituting a substantial step in furtherance of an act of prostitution.

Several cases are helpful in resolving that question: *Valdez*, 277 Or at 621; *State v. Moya*, 97 Or App 375, 775 P2d 927 (1989); and *State v. Loud*, 149 Or App 250, 942 P2d 814, *rev den*, 326 Or 58 (1997). Although those cases arose in the context of the legality of certain stops to investigate potential drug activity, they illustrate a broader principle: Evidence that a person is in a high-crime area, is engaged in ambiguous conduct, and appears to want to avoid police observation does not give rise to reasonable suspicion to stop

the person. If those circumstances fail to give rise to reasonable suspicion to stop a person, so much more do they fail to give rise to probable cause to arrest—the standard at issue here.

In *Valdez*, police officers saw the defendant and two other men in a motel parking lot in a high-vice area of Portland. The three men were preparing to get into a car when the officers drove by. The men stopped what they were doing and watched the officers. According to the officers, two of the men were dressed in "mod" clothing, which was unusual for the area. An officer described one of the men—who wore shined shoes, a leisure suit, and an "Afro" haircut—as looking "real sharp *** like a typical [drug] pusher[.]" 277 Or at 623. The officers turned their patrol car around to contact the men. As they did, they saw the defendant walk to the trunk of the car, open it slightly, and put a brown paper bag inside. The three men then got into the car and drove away, and the officers stopped them a few blocks later and searched the car.

The Supreme Court held that the officers did not have reasonable suspicion to stop the defendant and his companions. The court observed that, "[i]n this case we have persons who 'didn't look right' putting a paper bag into the trunk of an automobile—a not too remarkable action." *Id.* at 628. The court recognized that an experienced police officer may develop an intuitive sense about criminal matters, but held that

> "[s]uch instinct and experience cannot, however, form the entire basis for 'reasonable suspicion,' because no practical control can be exercised over police by courts if, in the absence of any very remarkable activity, the officer's instinct and experience may be used as the sole reason to justify infringement upon the personal liberty sought to be protected by [the reasonable suspicion requirement]."

*Id.* The court concluded that the circumstances that the officers had observed did not give rise to reasonable suspicion, stating, "shined shoes, sharp clothes, neat 'Afro' haircuts, and people who stand and stare at officers do not say very much—even in a setting where they are not usually found." *Id.*

In *Moya*, two police officers were patrolling the Old Town area of Portland, each in a marked patrol car, and they saw the defendant sitting in a car with Washington license plates parked across the street from a hotel. The officers testified that the hotel was known as the "Heroin Hotel" because it was in "an area of intense drug trade." 97 Or App at 377. They also testified that people who purchased drugs inside the hotel often consumed them nearby in parked cars or in the Park Blocks. *Id.* One of the officers told the other that, four days earlier, he had seen the defendant driving or parked by the hotel, after which she had driven to the North Park Blocks. When the officers pulled alongside the defendant from opposite directions, she was looking at an object in her hands or lap. She "looked surprised to see [the officers] and appeared to move the object from her lap into a purse, then to push the purse to her right onto the console. However, [the officers] could not see the object or her hands[.]" *Id.* One of the officers got out of his patrol car and asked the defendant, "What are you doing?" and "What's in the purse?" *Id.* The defendant answered, "Nothing. It wasn't even in my purse." *Id.* The officer seized and searched the defendant's purse.

We held that the officers lacked reasonable suspicion to believe that the defendant was involved in illegal drug activity. We explained that, although the defendant was in an area where extensive drug activity occurred,

> "[t]here is nothing inherently suspicious about parking in or 'frequenting' such an area. The location of [the] defendant's car and her earlier presence in the area may have assumed heightened significance had the officers noticed any other indications of likely criminal activity. However, the officers did not see any drugs or drug paraphernalia before stopping her. There is nothing remarkable about examining something in one's hands, appearing startled at a sudden confrontation with the police or denying the suggestion that one is involved in wrongdoing."

*Id.* at 378. Therefore, we concluded, the officers lacked objectively reasonable suspicion to stop the defendant. *Id.*

In *Loud*, two police officers watched a man pace back and forth on a street corner near a known drug house and attempt to flag down passing drivers. As we described,

"The officers associated the man's behavior with drug sales. At about 1:45 a.m., [the] defendant drove into the intersection, turned into the wrong lane to park next to the curb where the man was pacing, turned off the headlights of his car and honked the horn. The man went to [the] defendant's car and leaned into the driver's side window. After about a minute, the man stepped away from the car and [the] defendant pulled away from the curb at a high rate of speed, committing several traffic infractions."

149 Or App at 252. The officers followed the defendant and stopped him.

On appeal, we held that the "defendant's brief visit with a suspicious but unidentified person in an area known for drug sales" did not give rise to reasonable suspicion that the defendant was engaged in criminal activity. *Id.* at 254.[5] As we later explained in *State v. Briggs*, 229 Or App 660, 667, 212 P3d 1276, *rev den*, 347 Or 446 (2009), when describing our decision in *Loud*, neither the suspicious location, nor the suspicious behavior of the man whom the defendant contacted, suggested that the defendant was engaged in criminal activity. *See also Brown*, 31 Or App at 507-08 (police did not have reasonable suspicion to stop the defendant, whom they had seen walking in an area of high prostitution activity and talking to a known prostitute); *State v. Meyers*, 153 Or App 551, 553, 556, 958 P2d 187 (1998) (evidence that the defendant and a woman were in a surreptitiously parked car in an area known for prostitution activity was insufficient to give rise to reasonable suspicion that they were engaged in prostitution).

To summarize, in *Valdez*, *Moya*, and *Loud*, each of the defendants was in a high-crime area and had engaged in conduct that could be characterized as consistent with either lawful or unlawful activity. In *Valdez*, the defendant stopped what he was doing when he saw the officers and then, when they were turning around, slightly opened the trunk and put a brown paper bag inside. In *Moya*, the defendant was parked in an area where drug use was common

---

[5] We also held that the officers could stop the defendant based on the defendant's traffic infractions and could expand that stop to ask for his consent to search based on what they observed both before and after the stop. 149 Or App at 254.

and was looking at something in her hands or lap, which she then appeared to hide when she noticed the police. In *Loud*, the defendant had briefly visited a man whom the officers suspected was involved in drug sales and then drove away quickly. Those cases illustrate the rule that, although an officer is not required to rule out all innocent explanations for a person's conduct before stopping the person, an officer cannot stop a person without an objectively reasonable belief, based on observable facts, that the person has committed or is about to commit a crime. The fact that the person's conduct is consistent with criminal activity is not necessarily enough to give rise to reasonable suspicion. *Alvarado*, 257 Or App at 629. If a behavior is consistent with criminal activity, but is "not too remarkable," it will not support a stop. *Valdez*, 277 Or at 628; *Moya*, 97 Or App at 378. A stop cannot be based on speculation about what a person did or why the person did it. *Brown*, 31 Or App at 508.

We applied similar reasoning in *State v. Jacobs*, 187 Or App 330, 67 P3d 408 (2003), when we concluded that officers lacked probable cause to believe that the defendant was engaged in criminal activity. In *Jacobs*, the officers were driving in downtown Salem, which they considered a "high drug traffic area," when they saw three men on a sidewalk near a bank parking lot and automated teller machine. 187 Or App at 332. The men were "huddled together" and were looking around "in a nervous manner" when one of them— the defendant—passed what looked like money to one of the others. The officers suspected that a drug transaction was occurring, so they approached the men and said, "[I]t looks like you guys just did a drug deal." *Id.* The defendant denied the accusation and said that he had given the other man money for the bus. Without asking for consent, one of the officers searched the defendant and found a plastic bag containing marijuana.

The defendant appealed, asserting that the officers lacked probable cause to believe that he was engaged in criminal activity. The state argued that the officers possessed probable cause because they "had witnessed: (1) an exchange of money; (2) in downtown Salem, a 'high drug traffic area'; (3) while the participants were acting very nervously and apparently attempting to hide their activity." *Id.*

at 334. We first held that, in contrast to a previous case, *State v. Martin*, 327 Or 17, 956 P2d 956 (1998), there was "no evidence that the specific location was a site of continuous, hand-to-hand drug traffic. There is only a vague reference to the entirety of downtown Salem as a 'high drug traffic area.'" *Jacobs*, 187 Or App at 335. We then held that "furtiveness in the act of engaging in what may nevertheless be entirely lawful conduct does not establish an objectively reasonable basis for a belief that a crime has been committed." *Id.* at 336. In other words, the same combination of factors that failed to amount to reasonable suspicion in *Valdez*, *Moya,* and *Loud* also failed to amount to probable cause in *Jacobs*.

With those cases in mind, we return to the question before us: whether Kula had probable cause to arrest defendant. To resolve that question, we must consider the totality of the circumstances. Thus, we must consider both what defendant did, as well as what she did not do.

Defendant walked on a public sidewalk alongside 82nd Avenue, wearing a puffy jacket, above-the-knee skirt, and heeled boots. Although 82nd Avenue is a high-vice area of Portland, there is nothing inherently suspicious about being in such an area. *Loud*, 149 Or App at 254; *Moya*, 97 Or App at 378; *Brown*, 31 Or App at 507. Further, as in *Jacobs*, 187 Or App at 335, there was no evidence that any particular location where defendant walked or stopped was a site of prostitution activity; rather, there was only a general reference to the entirety of 82nd Avenue as a high-vice area.

Defendant had been arrested for prostitution-related crimes between 2004 and 2006. But, there was no evidence that she had been convicted of any crimes based on those arrests, nor was there any evidence that she had been arrested for any prostitution-related crimes in the four years since 2006. Kula, whose full-time assignment was to patrol 82nd Avenue for prostitution activities, did not know or recognize defendant.

As defendant walked north, she repeatedly looked over her left shoulder at traffic. But, as Kula testified, defendant did not wave or speak to anyone. Defendant's act of looking over her shoulder could be considered consistent

with prostitution activity, as Kula testified, but it could also be considered consistent with basic safety precautions. Defendant was alone, at night, in a high-crime area. It would be common for a woman in such circumstances to monitor the movement of vehicles around her, especially those that turned in front of her.

In addition, although some aspects of defendant's conduct were consistent with the behavior of women working as prostitutes on 82nd Avenue, as described by Kula, other aspects were not. Kula testified that the women will attempt to make eye contact with male drivers, interested drivers will signal back, and the women will acknowledge their responses. But, he did not testify that there were any such signals or acknowledgements between any male drivers and defendant. In particular, there was no evidence that the Tundra driver parked on Schuyler Street in response to any communication from defendant. Indeed, there was no evidence that the Tundra driver had passed or had even seen defendant before he parked on Schuyler Street. Nor was there any evidence about what the Tundra driver was doing while he was parked on Schuyler Street.

Notably, defendant did not engage in the conduct that would have most strongly indicated that she was working as a prostitute: She did not move quickly toward any vehicle, even though she had the opportunity to do so. As described above, defendant saw the Tundra parked in two locations. First, she saw the Tundra when it was parked on Schuyler Street. She looked at it, but continued walking. The Tundra driver pulled out onto 82nd Avenue, drove one block, and then turned east on Hancock Street. Defendant saw the Tundra a second time, after it came down Tillamook Street and parked in the Plaid Pantry parking lot. Defendant looked at it, but continued walking. She passed the lot's first driveway and continued to the second driveway, where she stopped and turned toward the truck. She adjusted her boot and then, according to Kula, took "maybe just a step or two * * * into the parking lot, but then was right back on the sidewalk and walking northbound."

Like the defendants' conduct in *Valdez*, *Moya*, *Loud*, and *Jacobs*, defendant's conduct in this case was "not too

remarkable." *Valdez*, 277 Or at 628. It was like stopping to watch the police and then putting a brown paper bag in a trunk, *id.*; examining something in one's hands, appearing surprised by police, and then denying wrongdoing, *Moya*, 97 Or App at 378; having a brief conversation with a person apparently engaged in drug sales and then driving away quickly, *Loud*, 149 Or App at 254; or handing money to another person while huddled together and looking around furtively, *Jacobs*, 187 Or App at 336. As in those cases, any conclusions about the reasons for defendant's observed conduct would be speculative. The conduct may have merited continued observation, but it was insufficient to support an arrest and all of the consequences—including handcuffing, search, and jail—that can follow an arrest.

In sum, we conclude that Kula did not have a substantial and objective basis for believing that it was more likely than not that defendant had engaged in conduct constituting a substantial step in furtherance of an act of prostitution. Therefore, his arrest of defendant violated her rights under Article I, section 9, and the evidence resulting from that violation should have been suppressed.

Reversed and remanded.