Argued and submitted June 11, reversed and remanded September 1, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

KENNETH EUGENE LEBANNO,
*Defendant-Appellant.*

Multnomah County Circuit Court
19CR46221; A172543

497 P3d 1280

An officer observed defendant and a second man in a high-crime area of a public park, behaving furtively with a small item before engaging in a handshake that appeared to conceal the transfer of the item. Defendant was immediately arrested, methamphetamine was discovered in his possession, and he was convicted of unlawful possession of methamphetamine. On appeal, defendant assigns error to the trial court's denial of his motion to suppress the evidence. Specifically, defendant argues that the arrest violated Article I, section 9, of the Oregon Constitution because it was not supported by probable cause to believe that he had engaged in an illegal drug transaction. *Held*: Because the totality of the circumstances known to the officer did not support probable cause to believe that defendant had just obtained illegal drugs from the second man, the trial court erred in denying defendant's motion to suppress the evidence obtained as a result of his warrantless arrest.

Reversed and remanded.

Andrew M. Lavin, Judge.

Mark Kimbrell, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Greg Rios, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

SHORR, J.

Reversed and remanded.

**SHORR, J.**

Defendant appeals from a judgment of conviction for unlawful possession of methamphetamine, assigning error to the trial court's denial of his motion to suppress evidence obtained following his warrantless arrest. Specifically, defendant argues that the arrest violated Article I, section 9, of the Oregon Constitution, because it was not supported by probable cause to believe that he had engaged in an illegal drug transaction. We agree, and, accordingly, reverse and remand.

We review the trial court's ruling denying defendant's motion to suppress for legal error. *State v. Maciel-Figueroa*, 361 Or 163, 165, 389 P3d 1121 (2017). In so doing, we are bound by the court's factual findings if there is constitutionally sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). We summarize the facts in accordance with those standards.

At 9:41 a.m. on a Monday in July, Portland Police Officer Browning was in downtown Portland's Waterfront Park engaged in a "spotting mission," or what he described as going "into the high crime areas and look[ing] for criminal activity." Browning was scanning the area underneath the Burnside Bridge with a pair of binoculars while he sat parked in an unmarked police car. Browning had worked as a police officer downtown for seven years, which included assignments in the Old Town neighborhood encompassing the northern part of Waterfront Park. He testified that "most of that time I worked on street level drug use and combating street level drug use [and] drug sales" and had dealt with over 100 drug cases during his career. Browning testified that the specific part of the park underneath the Burnside Bridge was a "high drug and vice area." He elaborated that it was common for the police to receive calls reporting drug use or drug sales at that location. He specified camping, loitering, and littering as other unlawful activities that frequently occur there. The area also hosts the Portland Saturday Market and is a popular spot for runners, walkers, bikers, and commuters.

With his binoculars, Browning spotted several people, including defendant, standing under the Burnside

Bridge about 100 feet away from where he was parked. His view of the group was unobstructed. Browning watched an individual (later identified as Cauley) walk up to the group and begin "socializing." Cauley then reached into a bag he was carrying and removed a "very small" item. Cauley held the item in the palm of his closed hand, opening his hand occasionally to look at the item or to allow defendant to look at the item, "then he would close it and look around for a little bit." Browning could not see what the item was. Cauley and defendant engaged in a handshake in which they slapped their hands together, slowly slid their hands back towards themselves with their hands still touching, locked their fingers together in a curled position, and finally let go and separated their hands. Defendant and Cauley then walked away in separate directions. Altogether, the men had interacted for less than 15 minutes.

Browning testified that he had seen the type of handshake the men engaged in before, and stated that it allows a person to "scoop out from whatever is in the [other person's] hand," is usually used when "somebody is trying to pass something off without letting anybody know that they are actually passing something off," and is "a common occurrence in a street level drug transaction." Browning believed that the men were "trying to be sneaky and hiding what they were doing." However, Browning also testified that the handshake was "commonplace" and seen in "everyday socializing" unrelated to criminal activity. Based on "the type of area we were in, the criminal activity that we were looking for, [and] the body language between [Cauley and defendant]," Browning believed that the men had "just exchanged some sort of illegal narcotics."

Browning "notified the assisting officers via radio" and asked them to detain defendant and Cauley. A second officer then approached defendant, placed him in handcuffs, read him his *Miranda* rights, and searched him, resulting in the discovery of a pipe and a small bag of methamphetamine. The officer asked defendant if he had obtained the methamphetamine from Cauley, to which defendant responded that he had.

        In advance of trial, defendant moved to suppress "all evidence, direct and derivative, discovered pursuant to an invalid search and seizure and to suppress all statements made by Defendant while in state custody." Specifically, defendant argued that the circumstances known to Browning at the time he radioed for defendant's arrest did not support an objectively reasonable belief that defendant had probably committed a crime. Defendant highlighted the fact that, despite Browning's testimony that the spot was a high-crime area, the interaction occurred on a weekday morning, when the area was open to the public and popular amongst walkers, runners, bikers, and commuters. He also argued that the handshake itself was not particularly suspicious and was common "in everyday occurrences that weren't drug deals." The state argued that several factors added up to probable cause: the fact that Cauley showed defendant a small item in his hand right before the handshake; the fact that the handshake was done slowly, supporting an inference that it was concealing an exchange; the fact that the handshake occurred in a high-crime location; and the fact that the men behaved furtively, as if they were trying to hide what they were doing. The trial court denied defendant's motion, concluding that the officers had probable cause to believe that defendant had just received illegal drugs from Cauley, and therefore probable cause to arrest him. Defendant entered a conditional no-contest plea, reserving in writing the right to challenge the court's denial of his motion. ORS 135.335(3). This timely appeal followed.

        On appeal, defendant assigns error to the trial court's denial of his motion to suppress the evidence discovered subsequent to his warrantless arrest. We review such rulings as a matter of law. *State v. Martin*, 260 Or App 461, 463, 317 P3d 408 (2014) (*Martin II*).[1] Defendant reiterates his argument that the officers "lacked an objectively reasonable basis to conclude that defendant was engaged in a drug transaction[,] and, therefore, lacked probable cause to arrest

_____

        [1] We cite two cases titled *State v. Martin* in this opinion. We refer to the 1998 case, *State v. Martin*, 327 Or 17, 956 P2d 956 (1998), as "*Martin I*," and the 2014 case, *State v. Martin*, 260 Or App 461, 317 P3d 408 (2014), as "*Martin II*," although the defendants in the cases are not the same and the cases are not related.

him." In so arguing, defendant highlights (1) the interaction occurred on a weekday morning in an area where noncriminal activities such as running, walking, biking, and commuting commonly occur; (2) Browning did not know defendant or Cauley, or possess any information other than their interaction that could have suggested that the men were involved with illegal drugs; and (3) Browning did not observe an exchange of money or see defendant reach in his pockets, making it unclear whether the men even exchanged anything during the commonplace handshake, let alone illegal drugs. The state argues that it was objectively reasonable for Browning to believe that defendant possessed illegal drugs because he had observed a furtive hand-to-hand transaction in a high-crime area. The state contends that those facts, viewed through Browning's experience with the handshake as a method for concealing street-level drug deals, establish probable cause.

We first consider the law that controls our analysis of defendant's warrantless arrest. Article I, section 9, protects individuals against unreasonable searches and seizures.[2] In accordance with those protections, arrests must be supported by probable cause. *Martin II*, 260 Or App at 469. Probable cause is present when an officer subjectively believes that it is more likely than not that a crime has been committed and that the person to be arrested has committed it, and when that subjective belief is objectively reasonable under the circumstances. *State v. Miller*, 157 Or App 489, 492, 972 P2d 896 (1998), *rev den*, 328 Or 365 (1999). In determining whether an officer possessed probable cause, we examine the totality of the circumstances known to the officer, including reasonable inferences that may be drawn from those circumstances in light of the officer's relevant training and experience. *State v. Sanchez-Anderson*, 300 Or App 767, 773, 455 P3d 531 (2019). Officer training and experience alone, however, are insufficient to establish probable cause without specific, observable facts that are particularized to the defendant. *State v. Aguilar*, 307 Or App 457, 470, 478 P3d 558 (2020) ("Officer experience might explain legal

---

[2] Article I, section 9, provides, in part: "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

but otherwise suspicious behavior to place it in context for the factfinder, but it cannot be a substitute for specific and articulable facts."). The state bears the burden of proving that a warrantless arrest was supported by probable cause. *State v. Barker*, 271 Or App 63, 68, 348 P3d 1138 (2015). If an officer possesses probable cause to arrest, they may also search the individual for reasonably concealable evidence of the crime of arrest. *State v. Owens*, 302 Or 196, 200-02, 729 P2d 524 (1986).

        In the instant case, the state does not dispute that defendant was arrested when the second officer intercepted him and placed him in handcuffs. Further, defendant does not dispute that Browning subjectively believed that defendant had just engaged in an illegal drug transaction. The only issue, then, is whether it was objectively reasonable for Browning to believe that, more likely than not, defendant had accepted illegal drugs from Cauley. In considering that question, the trial court relied on three cases: *State v. Martin*, 327 Or 17, 956 P2d 956 (1998) (*Martin I*), *State v. Jacobs*, 187 Or App 330, 67 P3d 408 (2003), and *State v. Green*, 67 Or App 70, 676 P2d 938, *rev den*, 297 Or 82 (1984). Because the parties also cite these cases to us in support of their arguments on appeal, and because we agree that all three cases are instructive to our analysis, we briefly recount the facts of those cases.

        In *Martin I*, an off-duty police officer was stopped behind a van at a red light at 11:20 p.m. 327 Or at 19. The officer observed the van's passenger gesture at the defendant, a man who was standing near a bus shelter on the adjacent sidewalk. *Id.* The defendant looked to his left and right, approached the van, put his head and one hand inside the open window for three seconds, and then turned and walked away while putting his hand in his pocket. *Id.* The officer knew that that particular corner was a location where hand-to-hand crack sales occurred "twenty-four hours a day, seven days a week," due to the fact that a number of drug dealers lived in a nearby apartment complex. *Id.* at 20, 22. Although he had not witnessed a transfer, what he did observe was consistent with other hand-to-hand transactions that he had observed at that very corner. *Id.* at 21. Two hours later when the officer was on duty, he returned

to the intersection, saw the defendant standing on the same corner, and arrested him. *Id.* at 20.

The Supreme Court concluded that the above facts were sufficient to establish that the officer possessed probable cause to believe that the defendant was dealing illegal drugs. *Id.* at 22. Specifically, the court noted the high-crime character of the specific corner where the defendant was observed; the defendant's presence there late at night without any "apparent purpose for being there"; the fact that the defendant looked both ways before approaching the van, "as if to assure that he would not be observed closely when he reached it"; and the fact that the "duration, intensity, [and] furtiveness [of the interaction], and defendant's apparent pocketing of something immediately afterward" were all consistent with a hand-to-hand transaction. *Id.* at 21. In addition, the court found it "[e]specially significant" that the defendant was at the location two hours later, "reinforcing the belief that he was dealing drugs on the corner." *Id.* at 22. The fact that the officer had not actually witnessed a hand-to-hand transaction did not diminish or eliminate his probable cause, considering the totality of the circumstances. *Id.* ("[S]eeing something in a suspected dealer's hand cannot be the *sine qua non* of probable cause, any more than any other single fact.").

Next, in *Jacobs*, an officer driving through downtown Salem at 6:00 p.m. observed the defendant and two other men on a sidewalk near a bank parking lot and ATM. 187 Or App at 332. The men were "huddled together" and looking around nervously as the defendant passed what appeared to be cash to one of the other men. *Id.* The officer regarded the entire downtown area as a "high drug traffic area," and believed that a drug transaction had just taken place. *Id.* He stopped the men and searched the defendant, discovering marijuana. *Id.*

We concluded that the officer lacked probable cause to search the defendant. *Id.* at 336. Although the state argued that the Supreme Court's decision in *Martin I* was instructive, we distinguished that case on several grounds. *Id.* at 335. First, unlike in *Martin I*, the events had not occurred at a specific location known for "continuous, hand-to-hand drug traffic," and the only evidence regarding the location

was "a vague reference to the entirety of downtown Salem as a 'high drug traffic area.'" *Id.* Additionally, the "defendant was observed at around 6:00 p.m. exchanging money in the vicinity of an ATM," not late at night at a location where there was no obvious, legal purpose for being there. *Id.* Lastly, we concluded that the defendant's furtive behavior did not establish probable cause, in light of the fact that there was no other persuasive evidence that a crime had probably occurred. *Id.* at 335-36.

Finally, in *Green*, an officer was patrolling downtown Portland at 5:30 p.m. in a marked police car when he observed the defendant and a known Ritalin dealer standing and talking outside a bar. 67 Or App at 72. The officer was familiar with street-level Ritalin transactions and knew that the specific area was a "major Ritalin distribution" location. *Id.* at 72-73. Fifteen minutes later, the officer drove back by the bar and saw the defendant with another man. *Id.* at 72. The man handed the defendant cash and the defendant reached into his pocket and removed a small unidentified object, which he held between his thumb and forefinger. *Id.* As the defendant started to hand the object to the man, he noticed the police car and jerked his hand back in his pocket. *Id.* The officer stopped and searched the defendant, discovering Ritalin. *Id.*

We concluded that the search was supported by probable cause, because the totality of the circumstances the officer observed supported his belief that he had just witnessed a street-level Ritalin transaction. *Id.* at 73. We placed special significance on the fact that the defendant jerked the item back into his pocket upon seeing the police car, concluding that the "defendant's attempt to conceal something quickly in apparent response to the presence of police[,] combined with the other factors[,] gave [the officer] an objective basis to believe it more likely than not that defendant was engaged in the illegal sale of a controlled substance." *Id.*

The state contends that the facts presented here are analogous to those in *Martin I* and *Green*:

"In all three cases, police observed a furtive hand-to-hand exchange between two people in a location known for high

drug activity. Indeed, the facts here are even stronger because in this case *** Browning saw the exchange occur through a specialized handshake that the officer recognized as a common method of conducting street-level drug transactions."

The state distinguishes *Jacobs*, arguing that the furtive hand-to-hand transfer of a small object in an area known for drug activity is far more suspicious than the furtive transfer of cash outside an ATM in an area that is not specifically suspect.

Although we consider this a close case, we do not agree that this case is more like *Martin I* and *Green* than *Jacobs*. In both *Martin I* and *Green*, the officers were aware of facts that supported an objectively reasonable inference not only that they had witnessed a transaction, but that the transfer was an *illegal drug sale specifically*. In *Martin I*, the officer observed the defendant standing out on the street corner, twice in a two-hour time span, late at night, when there was no other apparent purpose for him to be there. Considering that evidence in light of the defendant's interaction with the van and, significantly, the officer's familiarity with that street corner as a spot where crack was sold continuously, the Supreme Court concluded that it was reasonable for the officer to believe that the defendant was probably dealing illegal drugs. Likewise, in *Green*, the defendant attempted to transfer a pill-sized item for cash, 15 minutes after he was observed with a known Ritalin dealer, at a specific location where Ritalin was frequently sold, before jerking the item back into his pocket upon noticing a police car. Those facts allowed for a reasonable inference that the attempted transfer was probably a Ritalin deal. In contrast, here, Browning had no prior knowledge that defendant or the individuals that he was with were drug users or dealers. Defendant did not present cash to Cauley. Aside from the men's ambiguous handshake, Browning did not observe any conduct that indicated they were drug users or dealers, unlike the defendant's repeated presence on a street corner where drugs were sold in *Martin I* or the defendant's interaction with a known drug dealer immediately before the transfer in *Green*. Regardless, we do not rely on fact matching in determining probable cause—instead, we must

determine its existence based on the totality of the circumstances in each case. *Cf. State v. Senn*, 145 Or App 538, 545, 930 P2d 874 (1996) ("[I]n many aspects of search and seizure law, fact matching can be a fool's errand.").

"In the formation of probable cause, the stacking of inferences to achieve probable cause is impermissible." *State v. Goennier*, 291 Or App 694, 699, 422 P3d 391, *rev den*, 363 Or 481 (2018) (internal quotation marks omitted); *see also State v. Kolb*, 251 Or App 303, 313, 283 P3d 423 (2012) ("If the premises collectively are impermissibly speculative, or if any of the premises is individually insupportable, the stop was not supported by reasonable suspicion."). Here, although Browning's observations may support a reasonable inference that the two men had exchanged a small item when they shook hands, any additional inference that the item exchanged was illegal drugs requires stacking one inference on top of another: first, that the men transferred *something*, and, second, that that something was illegal narcotics. First, this record contains no direct evidence that the men transferred anything—defendant was not observed holding the item or reaching in his pocket after the men shook hands. Instead, the officer inferred from the circumstances that defendant accepted the item. That inference was reasonable under the circumstances, considering Browning's observation of a small item in Cauley's hand immediately before the handshake. But an additional inference that the small item was illegal narcotics amounts to speculation.

We consider the specific factors cited by the state that could potentially support probable cause, starting with the location where defendant was observed. Although we give due weight to Browning's testimony that the specific area under the Burnside Bridge was a "high drug and vice area," the interaction at issue in this case occurred midmorning in a popular downtown park that was open to the public and the site of a variety of legitimate, legal uses. The location here is not as strong a factor as the locations in either *Martin I* or *Green*, and certainly cannot establish probable cause in the absence of other compelling facts that are *particularized to defendant* and indicate that an illegal drug deal probably occurred. *See, e.g.*, *State v. Washington*,

284 Or App 454, 463-64, 392 P3d 348 (2017) (the fact that a person is in a high-crime area does not support reasonable suspicion; "the police must also identify particularized facts about the defendant that support the inference that the defendant's presence at the location is indicative of criminal activity").

The remaining factors that could plausibly indicate that the men exchanged illegal drugs are the size of the item and the men's furtive behavior. The size of the item, alone, is not particularly meaningful to our analysis without other evidence. That leaves the men's handshake and furtive behavior generally—the fact that Cauley looked around to his left and right as he held the item, and the fact that the men engaged in a handshake common to drug deals that appeared to mask a transfer. Although that behavior may have appeared suspect, it does not rise to the level of establishing probable cause that the men exchanged illegal drugs, either alone or when considered in conjunction with the totality of the other circumstances. As we already explained, Browning did not see the item or anything that could have indicated to him that the item was drugs, absent speculation. Although the men used a handshake common to drug deals, the handshake is also "commonplace" in "everyday socializing." Further, Browning never saw defendant give Cauley cash or anything else in return. And, despite the fact that the men behaved in a way that indicated that they did not want others to observe the item or what they were doing, we have often explained that the furtive nature of an interaction is relatively meaningless absent other indicators that criminal activity is afoot. *See, e.g.*, *Jacobs*, 187 Or App at 335 ("Mere furtiveness *** does not establish probable cause.").

On balance, Browning observed two men acting somewhat suspiciously, who apparently did not want others to observe a small item in their possession, while out mid-morning in an area of a downtown public park where various kinds of legal and illegal activity were known to occur. Those facts are insufficient to support defendant's arrest for illegal drug possession and are more analogous to *Jacobs* than *Martin I* and *Green*. Like in *Jacobs*, an officer observed furtive, suspicious behavior and an apparent transfer of

something in an area where drug traffic occurred. Although there are distinctions between the facts of the two cases, our end conclusion in *Jacobs* is nevertheless instructive here: "They may well have looked as if they were trying to hide what they were doing. But furtiveness in the act of engaging in what may nevertheless be entirely lawful conduct does not establish an objectively reasonable basis for a belief that a crime has been committed." *Jacobs*, 187 Or App at 336.

Although we do not decide whether the circumstances known to Browning could have established reasonable suspicion to investigate further had the events unfolded differently, our reasonable suspicion case law is somewhat instructive. Recently, we decided *State v. Hollins*, 312 Or App 682, 493 P3d 535 (2021). In *Hollins*, an officer observed a woman and the defendant during the afternoon, in a parking lot near several businesses and a bar called the Purple Parrot. *Id.* at 683. The bar was known to the officer as a place where criminal drug and weapons activity occurred, and the officer "had arrested people for various offenses—both inside and in the parking lot—about every other week." *Id.* The officer observed the two converse, engage in "some sort of hand-to-hand transaction" that included a "shake or a slap of hands," and part ways. *Id.* at 683-84. The officer had worked with the local drug task force and testified that hand-to-hand drug deals often followed this exact pattern: first the two converse, then there is "a shake of the hand or a slap," and then they part ways. *Id.* at 684. The officer approached the defendant and noticed cash in his hand. *Id.*

Considering those facts, we concluded that the officer had reasonable suspicion to stop the defendant. *Id.* at 687. We distinguished *Jacobs*, noting that *Jacobs* involved the heightened probable cause standard and less-compelling facts, and reviewed past cases where similar hand-to-hand transactions had met the lower reasonable suspicion standard. *Id.* at 687-89. Even though the transaction occurred in "broad daylight," in a parking lot near several different businesses, and between people the officer did not know, those factors did not diminish the officer's reasonable suspicion in light of the totality of the other circumstances. *Id.* at 689-91. In particular, we emphasized the officer's detailed

testimony that the interaction followed the exact pattern of a typical illegal drug transaction. *Id*.

*Hollins* and the instant case illustrate the distinction between reasonable suspicion and probable cause. When certain circumstances lead a police officer to suspect that criminal activity is afoot, our law permits that officer to investigate further, either through continued observation or by stopping and questioning the individual. But in the event that those investigations never reveal objective facts indicating the probable occurrence of a specific crime, the officer may not constitutionally arrest or search the individual. Simply put, the interaction here "may have merited continued observation, but it was insufficient to support an arrest and all of the consequences—including handcuffing, search, and jail—that can follow an arrest." *Martin II*, 260 Or App at 479; *see also State v. Daniels*, 234 Or App 533, 538, 228 P3d 695, *rev den*, 349 Or 171 (2010) ("Probable cause is a more rigorous standard than mere suspicion; even a well-warranted suspicion does not suffice, because a suspicion, no matter how well founded, does not rise to the level of probable cause." (Internal quotation marks omitted.)). Because the totality of the circumstances known to Browning did not establish probable cause that defendant had just obtained illegal drugs from Cauley, the trial court erred in denying defendant's motion to suppress the physical evidence and statements obtained as a result of his warrantless arrest.

Lastly, as previously noted, defendant's conviction resulted from his conditional no-contest plea, reserving in writing the right to appeal the trial court's denial of his motion to suppress, as permitted by ORS 135.335(3). Pursuant to that authority, defendant may withdraw his plea.[3]

Reversed and remanded.

---

[3] "In appeals arising from conditional pleas under ORS 135.335(3), we have consistently declined to engage in a harmless error analysis." *State v. Leach*, 294 Or App 639, 646, 432 P3d 310 (2018). "Employing a harmless error analysis would defeat [defendant's] statutory right. Defendant may, on remand, decide that [he] wishes to withdraw [his] plea and go to trial, or [he] may choose * * * not to withdraw it." *State v. Dinsmore*, 182 Or App 505, 519, 49 P3d 830 (2002).