Argued and submitted January 29, reversed and remanded April 23, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CRYSTAL DAWN WIGGINS,
*Defendant-Appellant.*

Linn County Circuit Court
11040663; A151055

324 P3d 626

David Sherbo-Huggins, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Patrick M. Ebbett, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and Haselton, Chief Judge, and Schuman, Senior Judge.*

---

* Duncan, P. J., *vice* Edmonds, S. J.

HASELTON, C. J.

## HASELTON, C. J.

Defendant, who entered a conditional plea of no contest, ORS 135.335(3),[1] for possession of methamphetamine, ORS 475.894, appeals the resulting judgment, assigning error to the trial court's denial of her motion to suppress evidence. We agree with defendant that she was stopped in violation of Article I, section 9, of the Oregon Constitution[2] no later than when a police officer, in the absence of reasonable suspicion, ordered her to move away from the vehicle that she had been driving and that the evidence that she seeks to suppress was the unattenuated product of that illegality. Accordingly, we conclude that the trial court erred in denying defendant's motion to suppress and reverse and remand.

We review the trial court's denial of defendant's motion to suppress for errors of law. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). In doing so, we are bound by the trial court's express and implicit factual findings if there is constitutionally sufficient evidence in the record to support them. *Id.* We state the facts in accordance with that standard.

On April 7, 2011, Aaron Davis, a City of Albany police officer with approximately seven and one-half years of "narcotics detective experience," was working with Hutch, his "narcotics detection trained police canine."[3] During the lunch hour, Davis pulled his unmarked vehicle into a parking lot at a public park to give Hutch a "break." Davis's view of pedestrians and vehicles entering the park from NE Waverly Drive was barred by a "jersey wall" until they had almost entered the parking lot, as was their view of his vehicle.[4]

---

[1] ORS 135.335(3) provides:

"With the consent of the court and the state, a defendant may enter a conditional plea of guilty or no contest reserving, in writing, the right, on appeal from the judgment, to a review of an adverse determination of any specified pretrial motion. A defendant who finally prevails on appeal may withdraw the plea."

[2] Article I, section 9, provides, in part, that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

[3] Davis was the primary witness at the suppression hearing. Unless otherwise noted, our quotations are taken from his testimony.

[4] According to Davis, the term "jersey wall" referred to concrete slabs or barriers that "were stacked on top of each other taller than" his vehicle.

While Hutch was taking his break, Davis noticed another vehicle parked "at the edge of the park with a single male occupant." Davis ran "a records check." He recognized the name of the vehicle's registered owner as that of a "reported * * * dealer of methamphetamine," but Davis could not determine whether the male occupant was the registered owner. At that point, Davis, who was wearing a uniform, saw a female—later identified as "Shawna"—"clear[] the edge of the jersey wall." Shawna looked in Davis's direction.[5] Then, "all at once" the vehicle that had been in the park left and a second vehicle driven by defendant "quickly pull[ed] up" and "pick[ed] up" Shawna and left the park traveling southbound on NE Waverly Drive. Based on what he had just observed, Davis believed that he "potentially had interrupted a drug deal."

Davis left the park, located the vehicle that defendant was driving, and followed it. Davis did not observe defendant commit any traffic infractions. He "ran" the vehicle's license plate number and learned that its "female registered owner * * * had a court ordered driver's suspension history for drugs."

After taking a circuitous route, defendant stopped at a house, which Davis recognized because, several years before, he had "processed a methamphetamine lab" there and, on a separate occasion, had "seized * * * drug evidence" from the house. Shawna got out of the vehicle and entered the house. According to Davis, based on his training and experience, it is common for a house in which methamphetamine has been manufactured to continue to be associated with "drug activity."

Defendant drove away. Davis followed but did not activate his lights or otherwise require defendant to stop the vehicle.

Eventually, defendant parked the vehicle at her apartment complex next to a dumpster. Davis parked his car

---

[5] The trial court found that Shawna's "direction of travel was consistent with her approaching [the vehicle with the male occupant], but it was also consistent with her continuing northward on NE Waverly pas[t] [that vehicle]" and that "Shawna never had any contact observed by Davis with [that vehicle] or its operator, nor is there any evidence he ever spoke with her."

"parallel" to and "approximately 30 feet" away from defendant's vehicle.

When defendant got out of the car, Davis asked her about her route of travel and what she was up to. According to Davis, defendant explained that she had given her friend Shawna—whose last name defendant did not know—a ride after Shawna had called her from a pay phone. Davis thought that response was "odd" because the nearest pay phone was "about a quarter mile away and in the opposite direction" of where he had first seen Shawna. Davis also indicated to defendant that he "suspect[ed] drug activity" and asked defendant whether she used drugs and whether she owned the vehicle that she had been driving. According to Davis, defendant "admitted to the previous use of both methamphetamine and marijuana" but told him that it "had been months since her last use" and explained that the vehicle was her mother's. By this point, another officer, Ronald Parker, had arrived.

Davis asked defendant for her identification, which she provided. He ran the identification, but there were no outstanding warrants. Davis returned the identification to defendant and continued speaking with her "mindful to keep it as a casual consensual encounter." At some point, defendant told Davis that she felt harassed and asked whether she could leave. According to Davis, "I told her point blank, 'This isn't a stop and you're free to go at any time. You've been free to go at any time.'" Defendant again indicated that she felt as though she was being harassed. Davis asked whether defendant had drugs on her person or in the car. Defendant said that she did not and that Davis could not look. Davis then requested defendant's "permission" to use Hutch to "sniff the exterior of her car." According to Davis, defendant would not allow it and "began making excuses about why she didn't want the canine to sniff the car and two of the excuses that she used were 'It's not my car' and 'Other people may have left things in the car,'" which Davis "had previously heard *** from people who were in possession of controlled substances in particular but also other evidence of crimes."

At that point, Davis made a "mental tabulation" of the following circumstances: (1) Davis had observed what he

believed was a "suspected drug deal in the park." (2) Defendant gave a ride to Shawna "whose last name [defendant] didn't know" and "who supposedly called from a pay phone when none was immediately present." (3) Shawna got out of the vehicle "in a high drug use area" and entered "a former drug house." (4) Defendant had "admitted" to a "previous history of two types of illegal drug use." (5) Defendant was not the registered owner of the car she was driving. (6) The vehicle's registered owner "had a documented drug history." (7) Defendant had made statements distancing herself from "potential evidence in the vehicle that could be attributed to her." And (8) defendant was in a "high drug trafficking and use area of the city."[6]

Davis then asked defendant to step away from the vehicle so that he could deploy Hutch to perform "an exterior sniff." Defendant refused. Davis asked again, and again defendant refused.

Both Davis and Parker testified as to what occurred next. According to Davis,

"I reached out to escort [defendant] away from the vehicle and she told me not to touch her. She kind of jerked her arm away and said[,] 'Don't touch me,' at which I complied, and then she went and sat on the hood of her car. I had to tell her twice rather directly to get off the car."

Consistently with Davis's testimony, Parker testified:

"When [Davis] first told [defendant] he wanted to do an air sniff then [defendant] was having difficulty, I would say, understanding that *we needed her to step away from the vehicle while he did this.* That took some convincing. Once she was convinced to step away from the vehicle *as she was interfering with his investigation* then she decided to sit on the hood of the car, and that was explained to her a couple of times that *she needed to get off the hood of the car so we could conduct the investigation. Once threatened with arrest[,] she finally stepped from the hood of the car* and stood in front of the car, and then that's when * * * Davis conducted a free air sniff with his canine."

---

[6] Davis also referred to a ninth circumstance—*viz.*, defendant's "evasive driving" when she left the park. Because the trial court expressly found that defendant was not driving evasively, we do not consider that circumstance.

(Emphasis added.) Based on that testimony, the trial court found:

> "Defendant was then ordered, by either Davis or Parker, to move away from the car to allow the search to occur under threat of being immediately arrested. She moved away."

At that point, Davis deployed Hutch, who is trained to detect cocaine, methamphetamine, heroin, and marijuana. On his second pass around the vehicle, Hutch "alert[ed]." According to Davis, he then saw "Hutch trace to the door seam, and that would be the front left door seam, sniff intently and then sit, which is an indication for the presence of one of those four odors." Parker testified that he "immediately placed [defendant] in handcuffs and advised her of her rights."

Based on Hutch's behavior and the eight circumstances described above, Davis believed that he had probable cause to search the vehicle. At this point, Davis searched the car, finding methamphetamine and drug paraphernalia in various places, and defendant made incriminating statements.

Defendant was charged with possession of methamphetamine and moved to suppress "all evidence derived from the stop of *** defendant, including oral derivative statements, and the subsequent warrantless search and seizure of her person and the vehicle." In the trial court, defendant contended that, because she had been unlawfully stopped, all evidence obtained as a result of that stop must be suppressed. Alternatively, defendant contended that, if she had been lawfully stopped, the warrantless search of the vehicle was not supported by probable cause or an exception to the warrant requirement.

In resolving defendant's motion, the trial court did not address defendant's primary contention that she had been unlawfully stopped and that all derivative evidence obtained as a result of that stop must be suppressed. Instead, the court denied defendant's motion, addressing only her alternative contention, reasoning that the warrantless search of the vehicle was supported by probable cause and the automobile exception to the warrant requirement.

Thereafter, defendant pleaded no contest to possession of methamphetamine, reserving in writing the right to challenge the court's suppression ruling. This appeal followed.

On appeal, defendant contends that the dispositive issues are those that the trial court did not address in resolving defendant's motion to suppress—*viz.*, (1) whether defendant was stopped, (2) if defendant was stopped, whether the stop was supported by reasonable suspicion, and (3) if defendant was unlawfully stopped, whether there was a causal "but for" connection between that illegality and the evidence that defendant seeks to suppress. Even though the court did not resolve those issues, we need not remand this case to the trial court to engage in the proper legal inquiry. That is so for two interrelated reasons.

First, as noted above, 262 Or App at 357, the trial court found that "[d]efendant was * * * *ordered,* by either Davis or Parker, *to move away from the car* to allow the search to occur *under threat of being immediately arrested.*" (Emphasis added.) The legal significance of that finding—which the state essentially acknowledged at oral argument—is that, by that point in the encounter, defendant had been stopped. *See State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010) (holding that a police-citizen encounter is a constitutionally significant seizure "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances *would* believe that (a) above has occurred" (emphasis in original)); *see also State v. Fair*, 353 Or 588, 594, 302 P3d 417 (2013) (explaining that, "[i]n applying that standard, we look to whether the encounter entailed a significant restraint on defendant's liberty imposed either by physical force or through some show of authority" (internal quotation marks and brackets omitted)); *State v. Ruiz*, 196 Or App 324, 327, 101 P3d 824 (2004), *rev den*, 338 Or 363 (2005) (holding that officer stopped defendant by ordering him to take his hand out of his pocket).[7]

_____

[7] *Cf. State v. Anderson*, 354 Or 440, 450, 313 P3d 1113 (2013) ("For an encounter between an officer and a citizen to be a seizure under Article I, section 9, the officer must add to [the] inherent pressures [of being approached on a street or in

Second, the court found that the stop occurred "to allow" the dog sniff. That finding demonstrates that the trial court identified a "but for" causal nexus between the stop and dog sniff. In other words, under the circumstances of this case, the court found that the stop was a necessary precondition to the performance of the dog sniff. Stated differently, had the officers not stopped defendant by ordering her away from the vehicle under the threat of arrest, the dog sniff and Hutch's corresponding alert—at which point the trial court concluded Davis had probable cause to search the vehicle—would not have occurred in this case.

In light of those findings, the dispositive issue is whether the stop was supported by reasonable suspicion— that is, whether the stop was lawful. That is a legal issue that we can resolve on appeal without the benefit of the trial court's reasoning. *See State v. Musser*, 253 Or App 178, 179, 289 P3d 340 (2012), *rev allowed*, 353 Or 533 (2013) ("Whether an officer has reasonable suspicion to stop a person is a question of law that we review for legal error.").

In *State v. Martin*, 260 Or App 461, 469-70, 317 P3d 408 (2014), we explained:

"An officer has reasonable suspicion to stop a person when the officer has an objectively reasonable belief, based on specific and articulable facts, that the person has committed or is about to commit a crime. The officer's suspicion must be particularized to the person and based on the person's conduct.

"The fact that there might be innocent explanations for conduct does not mean that the conduct cannot also give rise to reasonable suspicion of criminality. But, an officer may not stop a person simply because the person's conduct is consistent with criminal conduct; the nature of the conduct matters. As we explained in [*State v.*] *Alvarado*, [257 Or App 612, 629, 307 P3d 540 (2013),] where the state argued that a drug-trafficking stop was supported, in part, by evidence that '(1) the car defendant was driving was

_____

a public place] by either physically restraining the citizen's liberty in a significant way or engaging in a show of authority that, explicitly or implicitly, reasonably conveys to the person a significant restriction on the person's freedom to terminate the encounter or otherwise go about his or her ordinary affairs." (Internal quotation marks omitted.)).

owned by somebody else; (2) defendant was carrying a cell phone and a pager; and (3) the car contained multiple air fresheners and two bottles of cologne,'

> "'a set of facts will not always create a reasonable suspicion just because those facts are consistent with, but do not necessarily suggest, a crime being committed. Wearing clothing while driving, to use an extreme example, is also consistent with the transportation of narcotics. Less extremely, so too (for all we know) is wearing cologne. This consistency, however, would not be enough to support reasonable suspicion.'

"* * * * *

> "When evaluating the objective reasonableness of an officer's suspicion, a court considers the totality of the circumstances, viewed in light of the officer's experience. The officer's experience is relevant to what inferences the officer may draw from the circumstances. But, an officer's experience cannot form the entire basis for reasonable suspicion. Intuition or instinct, even of an experienced officer, cannot amount to reasonable suspicion of criminal activity."

(Some internal quotation marks and citations omitted; brackets in original.) Applying those principles to this case, we conclude that Davis did not have reasonable suspicion to stop defendant.

As noted above, 262 Or App at 355-56, before ordering defendant to move away from the car, Davis identified eight circumstances that gave rise to his suspicion. Again, those circumstances are as follows: (1) Davis had observed what he believed was a "suspected drug deal in the park"; (2) defendant gave a ride to Shawna "whose last name [defendant] didn't know" and "who supposedly called from a pay phone when none was immediately present"; (3) Shawna got out of the vehicle "in a high drug use area" and entered "a former drug house"; (4) defendant had "admitted" to a "previous history of two types of illegal drug use"; (5) defendant was not the registered owner of the car she was driving; (6) the vehicle's registered owner "had a documented drug history"; (7) defendant had made statements distancing herself from "potential evidence in the vehicle that could be attributed to her"; and (8) defendant was in a "high drug trafficking and use area of the city."

As an initial matter, two of those circumstances—*viz.*, defendant's presence in a "high drug trafficking and use area of the city" and her "admissions" to prior drug use months before the stop—carry minimal weight. With regard to the former, we have "repeatedly said that a person's presence in a location associated with drug activity is insufficient to support an objectively reasonable belief that that person is himself or herself engaged in drug activity." *State v. Bertsch*, 251 Or App 128, 134, 284 P3d 502 (2012). With regard to the latter, we have rejected the proposition that "a person's recent drug use is sufficient, without more, to establish reasonable suspicion of present drug possession." *State v. Holcomb*, 202 Or App 73, 77-78, 121 P3d 13, *adh'd to as modified on recons*, 203 Or App 35, 125 P3d 22 (2005); *see also State v. Ehret (A111248)*, 184 Or App 1, 9, 55 P3d 512 (2002) ("The fact that defendant had past involvement with drugs does not give rise to a reasonable suspicion that he possessed drugs at the time of the traffic stop[.]").

The remaining circumstances, in combination with those two, are collectively insufficient to establish reasonable suspicion in this case. Two salient observations demonstrate why that is so.

First, as we explained in *Martin*, "[t]he officer's suspicion must be particularized to the person and based on *the person's conduct*." 260 Or App at 469 (emphasis added). Simply put, many of the circumstances to which Davis referred did not concern *defendant's conduct*. For example, the fact that the registered owner of the car that defendant was driving—that is, defendant's mother—"had a documented drug history" and the fact that Shawna got out of the car in a high crime area and entered a former drug house concern defendant's mother's and Shawna's conduct, not defendant's. Similarly, as to the suspected drug deal in the park, the genesis of Davis's suspicion was the fact that the registered owner of the vehicle that he spotted at the edge of the park was a reported drug dealer. Putting aside the fact that Davis did not know whether the male occupant of that vehicle was the registered owner, the owner's reported drug-related activities do not concern defendant's conduct.

Second, Davis explained that, in his experience, "people will utilize vehicles not registered to them when they're in the course of committing crimes, which would include buying and selling drugs, so as to thwart law enforcement's attempts to identify them" and defendant's statements "distancing herself from potential evidence in the vehicle that could be attributed to her" were a "red flag" or "excuse as to why there is something there but they don't want it to be theirs." Although "[t]he officer's experience is relevant to what inferences the officer may draw from the circumstances," *Martin*, 260 Or App at 470, the inferences that Davis drew in this case were not reasonable. As the trial court found and the record demonstrates, during Davis's initial questioning of defendant, he learned that defendant's mother was the registered owner of the vehicle that defendant had been driving. Under that circumstance, it was not reasonable for Davis to infer that defendant was using the vehicle in the course of committing a crime so as to thwart law enforcement's efforts to identify her.

Ultimately, when considered in their totality in light of Davis's experience, the circumstances in this case establish nothing more than that defendant, who had admitted to using drugs months before the stop, was present in high drug use areas and was associating with others who had been or may have been involved in drug-related activities.[8] If that were sufficient to establish reasonable suspicion, we would be effectively sanctioning nonparticularized status-based stops of individuals who have used drugs in the past. The law does not go that far.

In sum, here, defendant was stopped no later than when she was ordered to move away from the vehicle that she had been driving under the threat of immediate arrest. That stop was not supported by reasonable suspicion and was unlawful. Under the circumstances in this case, the evidence that defendant seeks to suppress was the unattenuated product of that illegality because, but for the illegal stop, the investigatory dog sniff would not have occurred,

---

[8] *Bertsch*, 251 Or App at 134 ("[I]t is not reasonable to conclude that a person is involved in drug crimes because he or she is in the company of a known drug user or dealer.").

which, in turn, led to Hutch's alert, defendant's incriminatory statements, and the search of the vehicle.[9] Accordingly, the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.

---

[9] As explained above, 262 Or App at 359, 362, the trial court found that, under the circumstances of this case, stopping defendant was a necessary precondition to the performance of the dog sniff and we have concluded that that stop was unlawful. Those determinations necessarily foreclose the state's contentions that (1) "the officer did not exploit any alleged illegality" because "[t]he officer did not need reasonable suspicion to conduct a dog-sniff of a car parked in a public place" and "the dog-sniff would have occurred regardless of the seizure of defendant"; (2) "there was an intervening lawful seizure of defendant when the dog alerted to the car providing probable cause for her arrest"; (3) "subsequent post-*Miranda* statements following her lawful arrest were sufficiently attenuated from that preceding illegality to avoid the exclusionary rule"; and (4) the discovery of the drugs was "the result of an undisputedly lawful search that was entirely independent of the unlawful stop." (Internal quotation marks omitted.)