Submitted April 29, 2009, reversed and remanded March 31, 2010

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**DOUGLAS JAMES KLEIN,**
*Defendant-Appellant.*

Multnomah County Circuit Court
070331537; A136435

228 P3d 714

Peter Gartlan, Chief Defender, and Zachary Lovett Mazer, Deputy Public Defender, Appellate Division, Office of Public Defense Services, filed the briefs for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Susan G. Howe, Senior Assistant Attorney General, filed the brief for respondent.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

ARMSTRONG, J.

**ARMSTRONG, J.**

Defendant appeals his conviction for possession of methamphetamine, ORS 475.894, arguing that the trial court erred when it denied his motion to suppress evidence found on his person. Defendant argues that the arresting officer unlawfully extended a lawful traffic stop by asking defendant questions about drugs that were unrelated to the stop; that the officer unlawfully expanded the subject matter of the traffic stop by asking those questions without reasonable suspicion that defendant possessed drugs; and that defendant's consent to the search of his person was the unattenuated product of that unlawful conduct. We reverse and remand.

Defendant was riding his bicycle at night in Portland without reflectors or lights. He turned into a Plaid Pantry parking lot without using an arm signal. Riding a bicycle at night without reflectors or lights and failing to signal a turn are traffic violations. Portland Police Officer Hertzler observed those violations and pulled his patrol car into the Plaid Pantry parking lot to speak to defendant about them, but he did not activate the overhead lights on his patrol car. Hertzler got out of his car, approached defendant, and identified himself while defendant was "fidgeting" with and trying to turn on a red light on the back of his bicycle. Shortly after contacting defendant, a second "cover" officer arrived.

Defendant apologized to Hertzler for not having his light on, and Hertzler talked to defendant about the dangers of riding in the dark without a light and told him that he had committed two traffic violations. Hertzler requested defendant's identification, and defendant gave him a Washington State identification card. Hertzler then returned to his patrol car, ran a standard records check, and found no warrants for defendant, although he learned that defendant was being supervised by community corrections for a prior conviction for first-degree burglary. The cover officer remained with defendant. It took a few minutes for Hertzler to get the results of the records check. Hertzler testified that he did not remember whether he returned defendant's identification before running the warrant check, and he did not tell defendant that he was running the check.

Hertzler returned to defendant and noticed a key ring with approximately 30 keys on it hanging near defendant's bicycle seat. The keys appeared to be house and car keys; some of the keys appeared blank and others appeared to have been filed down. Hertzler believed the keys could be burglary tools. Possession of burglary tools is a violation of ORS 164.235.[1]

Rather than asking about the keys, Hertzler asked defendant if he had any drugs on him. Defendant paused and then said, "No." Hertzler asked to search defendant, and defendant said that he would rather Hertzler not search him. Hertzler asked defendant "what his probation officer would think about * * * the keys," and defendant said that he did not know. Defendant explained that he had just gotten the keys, that he had found some of them, and that others "went to somebody." Hertzler asked defendant if he had anything on his person that defendant did not want him to know about, and defendant answered, "Nothing really."

Finding that answer odd, Hertzler asked defendant "if he had * * * a large amount of meth on him or a small amount of meth or if he had anything on him like that." After a moment, defendant answered that he had a little bit of marijuana and "a little bit of shit," which Hertzler understood as slang for methamphetamine. Hertzler asked defendant if he had a personal amount of methamphetamine, and defendant said, "Yes," but that he only used methamphetamine and did not sell it, and that he possessed about a gram of methamphetamine.

---

[1] ORS 164.235 provides:

"(1) A person commits the crime of possession of a burglary tool or theft device if the person possesses a burglary tool or theft device and the person:

"(a) Intends to use the tool or device to commit or facilitate a forcible entry into premises or a theft by a physical taking; or

"(b) Knows that another person intends to use the tool or device to commit or facilitate a forcible entry into premises or a theft by a physical taking.

"(2) For purposes of this section, 'burglary tool or theft device' means * * * [an] explosive, tool, instrument or other article adapted or designed for committing or facilitating a forcible entry into premises or theft by a physical taking.

"(3) Possession of a burglary tool or theft device is a Class A misdemeanor."

Defendant got upset and explained to Hertzler that he had only come to the Plaid Pantry to buy a Coke. Defendant had a dollar on him and Hertzler took the dollar to buy a Coke for defendant. When Hertzler returned, defendant began to drink the Coke, and Hertzler asked defendant if the methamphetamine was on his person, and asked if he could get the drugs. Defendant turned around and put his arms up, by which Hertzler understood defendant to have given his consent to be searched. Hertzler searched defendant, found marijuana and methamphetamine, and cited defendant for possession of controlled substances.

Hertzler characterized the entire encounter as calm and casual. Hertzler did not tell defendant that he had to comply with any requests, did not demand consent to search him, and did not physically touch defendant except during the search. Defendant did not try to leave during the encounter with Hertzler. Hertzler testified that it generally takes him about 10 minutes to complete a normal traffic stop. Three or four minutes passed between the beginning of the stop and the end of the warrant check. Defendant's admission of drug possession came at about eight minutes into the stop, and it was at that point that Hertzler left to purchase the Coke for defendant.

At trial, defendant moved to suppress the drug evidence found on his person. Defendant agreed that the initial stop was valid, based on the two traffic violations, and that Hertzler was entitled to make a reasonable inquiry about the keys after seeing them. Defendant contended that Hertzler's question about drugs was impermissible without reasonable suspicion, that Hertzler did not have reasonable suspicion that defendant possessed drugs or was under the influence of drugs at the point that he began to question defendant about drugs, and that those questions violated Article I, section 9, of the Oregon Constitution. The state argued that Hertzler was not required to have a reasonable suspicion that defendant possessed drugs before questioning him about them. Alternatively, the state argued that, because the conversation with defendant was not coercive, defendant's subsequent consent to search was not involuntary and, therefore, the drug evidence should not be suppressed. The trial court

assumed that Hertzler lacked authority to question defendant about drugs but concluded that there was no evidence that defendant felt coerced into giving his consent to be searched. In any event, the court determined that if there were an extension of the stop, because the questioning occurred within the time that it would have taken Hertzler to issue a citation for the traffic violations, any extension was *de minimis* and did not rise to the level of a constitutional violation requiring suppression. The court denied defendant's suppression motion, and defendant was convicted of possession of a controlled substance on stipulated facts.

On appeal, defendant argues that, although the initial traffic stop of defendant was legal and that, upon seeing the keys hanging from defendant's bike seat, Hertzler may have had a sufficient basis to inquire about the keys, Hertzler did not have any basis to inquire about drug possession. That inquiry, defendant contends, delayed the progress of an ongoing traffic stop and an arguably permissible inquiry into the keys. In defendant's view, by delaying both of those inquiries, Hertzler impermissibly extended the duration of the traffic stop in violation of Article I, section 9, thus, requiring suppression of the resulting evidence. The state counters that Hertzler's questions about drugs took, at most, one minute, and that any delay in processing the traffic stop or conducting a permissible inquiry into the keys effectuated, at most, a *de minimis* delay that did not render the duration of the traffic stop constitutionally unreasonable.

We begin by noting what is not at issue on appeal. Both parties agree that the initial stop of defendant for non-criminal traffic violations was valid. Additionally, defendant concedes that Hertzler was arguably entitled to question him about the keys on his bicycle seat. The record is clear that Hertzler had no basis to suspect that defendant possessed drugs when he questioned defendant about them, and that that inquiry occurred during the time that it would have taken Hertzler to write a traffic citation. Thus, the only issue for us to consider is whether, when Hertzler had a sufficient basis to inquire about the keys, it was lawful for him to question defendant about drug possession.

Article I, section 9, of the Oregon Constitution establishes the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]" Police may stop and briefly detain motorists for investigation of noncriminal traffic violations without violating Article I, section 9. Recently, the Supreme Court discussed the extent of that authority in *State v. Rodgers / Kirkeby*, 347 Or 610, 227 P3d 695 (2010).

In *State v. Rodgers*, 219 Or App 366, 182 P3d 209 (2008), *aff'd*, 347 Or 610, 227 P3d 695 (2010), the defendant was stopped for driving with a burned-out license plate light. During the course of the traffic stop, one officer noticed sores on the defendant's face that the officer believed to be consistent with methamphetamine use and items in the car that he believed were likely used to produce methamphetamine. However, the defendant's records check had come back clear, and, as the state conceded, the officer did not at that point have enough information to arrest the defendant for manufacturing methamphetamine. Two officers then approached the defendant, asked about the objects in the car, and, eventually, asked for consent to search the vehicle; the resulting search yielded evidence of precursor materials for manufacturing methamphetamine. We concluded that the officers had unlawfully extended the traffic stop when, rather than issuing a traffic citation, they asked the defendant about the items in the car without reasonable suspicion to believe that the defendant was involved in criminal conduct. *Id.* at 372-74.

In *State v. Kirkeby*, 220 Or App 177, 185 P3d 510 (2008), *aff'd*, 347 Or 610, 227 P3d 695 (2010), the defendant was stopped for driving with a suspended license. The defendant got out of his vehicle and walked toward the officer, who was concerned for his safety because the defendant had left his vehicle. The officer took the defendant's information and had all of the information necessary to complete a traffic citation, but he proceeded to ask the defendant if he had any weapons on his person. The defendant consented to a patdown and, although the officer was reasonably confident that the defendant did not have any weapons, the officer nonetheless asked for consent to examine the items that he had felt in the defendant's pockets. The defendant consented, and an

examination of those items yielded drug evidence. We concluded that, at the point that the officer asked about weapons, he was not waiting for any additional information to issue a citation and complete the traffic stop, and, hence, he unlawfully extended the stop by asking for consent to a search that was unrelated to the traffic stop. *Id.* at 186.

The Supreme Court affirmed our decisions in *Rodgers* and *Kirkeby*. *Rodgers/Kirkeby*, 347 Or at 630. In doing so, the court distinguished between inquiries during the course of a traffic stop and police conduct that involves physical restraint or a show of authority. Inquiries, the court explained, "are not searches and seizures and thus by themselves ordinarily do not implicate Article I, section 9." *Id.* at 622. In contrast, "police conduct that involves physical restraint or a show of authority that restricts an individual's freedom of movement typically does implicate Article I, section 9." *Id.*

The court then noted that a traffic stop is not an ordinary police-citizen encounter because, in contrast to a person on the street who may end the encounter at any time, a motorist is not free to end the encounter when he or she chooses.

> "Police authority to detain a motorist dissipates when the investigation reasonably related to that traffic infraction, the identification of persons, and the issuance of a citation (if any) is completed or reasonably should be completed. Other or further conduct by the police, beyond that reasonably related to the traffic violation, must be *justified* on some basis other than the traffic violation."

*Id.* at 623 (emphasis in original). The court reiterated the constitutional principles that apply to traffic stops:

> "Police conduct during a noncriminal traffic stop does not further implicate Article I, section 9, so long as the detention is limited and the police conduct is reasonably related to the investigation of the noncriminal traffic violation. However, a police search of an individual or a vehicle during the investigation of a noncriminal traffic violation, without probable cause and either a warrant or an exception to the warrant requirement, violates Article I, section 9. Because police inquiries during a traffic stop are neither

searches nor seizures, police inquiries in and of themselves require no justification and do not necessarily implicate Article I, section 9. However, *police inquiries unrelated to a traffic violation, when combined with physical restraint or a police show of authority, may result in a restriction of personal freedom that violates Article I, section 9.*"

*Id.* at 624 (emphasis added).

The court's application of those principles to *Rodgers*'s case is particularly informative. In that case, when the officer returned to the defendant after completing a records check, he had sufficient information to issue a citation and conclude the encounter. Accordingly, the officer's authority to detain the defendant "evaporated from that point," because, rather than issuing a citation and concluding the stop, the officer proceeded to conduct an inquiry that was unrelated to the traffic stop. *Id.* at 626. The officer's continued inquiries and request to search were made by one officer from the driver-side window while a second officer was stationed on the passenger side of the car. The defendant was not told that he was free to leave, and he did not know that the officer's questions were unrelated to the traffic investigation and that his cooperation was no longer required. The court concluded that those facts constituted a sufficient " 'show of authority' that, in combination with the unrelated questions concerning the items in the car and the request to search the car, resulted in a significant restriction of [the] defendant's freedom of movement." *Id.* at 627.

Here, Hertzler had the information that he needed to conclude the traffic stop when he returned to speak with defendant after completing the warrant check. At that point, he asked defendant about drugs without any suspicion that defendant possessed drugs or was under the influence of drugs. His questions occurred in the presence of a second, cover officer. Defendant was not told that he was free to leave and did not know that Hertzler's questions were unrelated to the traffic investigation. Those facts are indistinguishable from the facts that the Supreme Court concluded in *Rodgers /  Kirkeby* constituted a "show of authority."

■■ However, in this case, Hertzler had seen keys hanging near the seat on defendant's bicycle. Based on the large

number of keys and their unusual characteristics—several appeared to be blanks or to have been filed down—and the information that Hertzler had received from the warrant check—that defendant was on community supervision for a prior conviction for first-degree burglary—Hertzler believed that the keys could be burglary tools. At that point, Hertzler had a reasonable suspicion that defendant possessed burglary tools in violation of ORS 164.235. That suspicion gave Hertzler sufficient justification to inquire *about the keys*, which he did. However, after getting an answer to his question about the keys, Hertzler returned to questions about drugs without, again, a reasonable suspicion to believe that defendant possessed them. That inquiry, on matters about which Hertzler did not have reasonable suspicion, unconstitutionally extended the duration of the stop as to either the traffic offense or unlawful possession of burglary tools.

We conclude that Hertzler's inquiry about drugs and subsequent requests for consent to search defendant's person impermissibly extended the stop in violation of Article I, section 9. Defendant's consent to the search was the product of that illegality, and the evidence obtained from the search of defendant's person must be suppressed. *See Rodgers/Kirkeby*, 347 Or at 628-30.

Reversed and remanded.