Argued and submitted February 24, 2015, McKay High School, Salem, affirmed
June 17, 2015

## STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

## GREGORY PASKAR,
*Defendant-Respondent.*

Lincoln County Circuit Court
122974; A154885

352 P3d 1279

Anna M. Joyce, Solicitor General, argued the cause for appellant. With her on the brief was Ellen F. Rosenblum, Attorney General.

Anne Fujita Munsey, Senior Deputy Public Defender, argued the cause for respondent. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

TOOKEY, J.

**TOOKEY, J.**

In this criminal case, one of three related cases that we decide today, *see State v. Ene*, 271 Or App 858, 353 P3d 597 (2015); *State v. Anton*, 271 Or App 860, 353 P3d 596 (2015), the state appeals the trial court's order granting defendant's pretrial motion to suppress evidence. ORS 138.060(1)(c). State police troopers discovered the evidence during an encounter with defendant and his codefendants, Anton and Ene, that took place 28 miles offshore from Newport while the three men were fishing. We agree with the trial court that the troopers seized defendant in violation of Article I, section 9, of the Oregon Constitution when they announced that they would inspect all three codefendants' halibut tags. Accordingly, we affirm.

We are bound by the trial court's findings of fact as long as there is constitutionally sufficient evidence to support them. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). In the absence of express factual findings, we presume that the trial court decided the disputed facts in keeping with its ultimate conclusion. *Id.* On appeal, "[o]ur function is to decide whether the trial court applied legal principles correctly to those facts." *Id.* The trial court made extensive findings of fact, and we draw the following facts from those findings and undisputed facts in the record.

On August 18, 2012, Oregon State Police troopers Canfield and Van Meter were on patrol 28 miles offshore in an all-depth halibut fishery.[1] They were in a Zodiac vessel that had no police insignia but did have blue lights and a siren. The troopers were in uniform and wearing their badges.

There were many boats in the area that the troopers were patrolling, which is known as the chicken ranch. The first boat that the troopers encountered was a 22-foot open boat of which defendant, Anton, and Ene were the only occupants. As the officers first approached the boat, defendant's line was in the water, and he was landing a fish. The troopers waited at a distance of 10 to 15 yards until the fish

---

[1] At the hearing, Canfield testified that he is authorized to enforce Oregon law up to 50 miles from shore.

was landed. They observed that it was a yellow-eye rockfish, a species prohibited to keep in that fishery.

Defendant landed and released the yellow-eye rockfish without removing it from the water. A fish that is brought up from several hundred feet below the surface and then released at the surface will die. Canfield testified that the State Department of Fish and Wildlife has recently made devices available to anglers that increase a fish's chances of survival after it is caught and released; use of those devices is not required, but an angler must release a prohibited species unharmed. Defendant did not use any such device to increase the fish's chances of survival. As a result, after defendant released the fish, it floated belly-up at the surface. At that point, in Canfield's view, defendant, Anton, and Ene were no longer free to leave.

After defendant released the fish and it floated away, the troopers approached to within five to 10 feet of the boat and asked defendant, Anton, and Ene if they had caught any fish that day. Anton responded that they had caught three halibut. Canfield testified that halibut tags must be validated immediately after a halibut is caught.

Canfield "announced that the troopers would approach to inspect the halibut tags." He said, "we'd like to look at your tags; please get them out for us," or something very similar. His statement "had the tone and content of a command * * *, as opposed to being a mere question to the men." The purpose of the inspection "was to make sure that [the tags] had been validated, in other words, to make sure that the men had not committed a crime by failing to properly record the catch." The troopers pulled closer and grabbed the boat.

Defendant, Anton, and Ene gave their tags to the troopers, who observed that the tags had not been validated. Canfield then asked to inspect the fish, and one of the three men opened a cooler on the deck. In the cooler, Canfield saw halibut as well as two prohibited species—canary rockfish and ling cod.

The troopers were relaxed and conversational throughout the encounter. When they grabbed the boat,

their primary purpose was "to check the halibut tags and see what fish had been landed." Canfield could not remember whether they eventually warned the men about defendant's failure to release the yellow-eye rockfish unharmed. Van Meter testified that, at some point during the interaction, the troopers did give a verbal warning, but she did not remember when.

The troopers testified that it is common for anglers in one boat to ask anglers in another boat how the angling is going. Canfield explained that, while troopers are "talking with a boat, checking things," another boat will sometimes "pull over, start kidding their buddies about being checked." When people talk between boats, the people in one boat often hold onto the other boat to avoid having the boats bang together or separate. There were two- to three-foot swells and a light breeze when the troopers grabbed the boat, so the troopers grabbed the boat for the safety of the occupants of both boats.

Based on the troopers' observation of his unmarked halibut tag and the fish in the cooler, defendant was charged with three counts of violating sport fishing regulations with a criminally negligent mental state.[2] Each count was charged as a Class A misdemeanor, *see* ORS 496.992(1) ("Except as otherwise provided by this section or other law, a violation of any provision of the wildlife laws, or any rule adopted pursuant to the wildlife laws, is a Class A misdemeanor if the offense is committed with a culpable mental state."), and, accordingly, carried a penalty of up to one year of imprisonment, ORS 161.615(1), and a fine of up to $6,250, ORS 161.635(1)(a). Anton and Ene were each charged with two counts of violating sport fishing regulations with a criminally negligent mental state, also Class A misdemeanors.

Defendant, Anton, and Ene each moved to suppress the evidence that the troopers had obtained through their contact with the men, arguing that the troopers had

---

[2] Defendant was charged with unlawful failure to validate harvest card, ORS 498.002; OAR 635-011-0100 (1/1/12); exceeding daily bag limit of halibut, ORS 498.002; OAR 635-039-0080 (4/24/12); and continuing to angle after reaching daily bag limit, ORS 498.002; OAR 635-011-0100 (1/1/12).

stopped them in violation of Article I, section 9, and the Fourth Amendment to the United States Constitution and that the troopers had exploited the illegal stop to obtain the evidence. At a joint hearing on the three codefendants' motions to suppress, the state contended, *inter alia*, that the troopers had never stopped the men; that, even if the troopers had stopped the men, the stop was justified by, at least, reasonable suspicion that defendant had committed a crime—criminally negligent failure to release the yellow-eye rockfish unharmed; and that the troopers had obtained the evidence through a lawful administrative search.

The trial court agreed with defendant, Anton, and Ene. It first rejected the state's argument that the search was a lawful administrative search, noting that, "[i]f offenders face criminal sanctions, the inspection implicates criminal law enforcement purposes and is not 'administrative in nature.'" *Nelson v. Lane County*, 304 Or 97, 104, 743 P2d 692 (1987). Then it concluded that the troopers had probable cause to believe that defendant had failed to release the yellow-eye rockfish unharmed. Thus, the court reasoned, the troopers were entitled to stop defendant for the purpose of issuing a warning or charging him with a crime or violation regarding the yellow-eye rockfish.

The court concluded that the troopers stopped all three men when Canfield "announced" "we'd like to look at your tags; please get them out for us." The court determined that "[s]uch a statement is not a request to inspect, but an announcement that an inspection is forthcoming. It is a show of authority." The court explained that the announcement "converted the 'mere encounter' into a 'stop'" because it was "'conduct significantly beyond that accepted in ordinary social intercourse.'" (Quoting *State v. Holmes*, 311 Or 400, 410, 813 P2d 28 (1991).) The court concluded that Canfield's question whether the men had caught any fish that day, by contrast, was mere conversation. Ultimately, the court concluded that, pursuant to *State v. Rodgers/Kirkeby*, 347 Or 610, 227 P3d 695 (2010), the troopers' requests to inspect the three men's halibut tags violated Article I, section 9, because the stop was not related to the release of the yellow-eye rockfish; rather, it was focused on the men's halibut-related

activities.[3] In arguing that point at the hearing, counsel for defendant Anton explained that "the yellow-eye rockfish is a red herring."

Accordingly, the court granted defendant's motion to suppress. Pursuant to ORS 138.060(1)(c), the state appeals, arguing that the troopers did not stop defendant, and, that, even if there was a stop, it was justified by the troopers' observation of defendant's failure to release the yellow-eye rockfish unharmed.

Article I, section 9, guarantees individuals the right to be "secure in their persons, houses, papers and effects, against unreasonable search, or seizure." Under that provision, government officials may not "embark on a search or seizure for evidence to be used for [a criminal prosecution]" absent "individualized suspicion of wrongdoing." *State v. Boyanovsky*, 304 Or 131, 134, 743 P2d 711 (1987).

"[I]n determining whether a particular governmental action violates Article I, section 9, of the Oregon Constitution, we first must decide whether the action is either a 'search' or a 'seizure' within the meaning of that section." *State v. Juarez-Godinez*, 326 Or 1, 5, 942 P2d 772 (1997) (footnote omitted). Accordingly, here, the first question that we must answer is whether the troopers seized defendant. The Supreme Court has explained that "encounters between law enforcement officers and citizens are of an infinite variety." *State v. Backstrand*, 354 Or 392, 398, 313 P3d 1084 (2013). "Of that infinite variety, 'only some implicate the prohibition in Article I, section 9, against unreasonable "seizures."'" *Id.* at 398-99 (quoting *State v. Ashbaugh*, 349 Or 297, 308, 244 P3d 360 (2010)).

> "Analytically, police-citizen encounters typically fall into one of three categories that correlate the degree of intrusiveness on a citizen's liberty with the degree of justification required for the intrusion. At one end of the continuum are mere encounters for which no justification is required.

---

[3] The court also concluded that all three codefendants remained stopped throughout the encounter because the troopers took and retained their halibut tags. Because we agree with the court's first conclusion—that the men were stopped by Canfield's announcement that the troopers would inspect their tags—we do not address that additional reasoning.

At the other end are arrests, which involve protracted custodial restraint and require probable cause. In between are temporary detentions for investigatory purposes, often termed 'stops,' which generally require reasonable suspicion. Both stops and arrests are seizures for constitutional purposes, while less restrictive encounters are not."

*State v. Fair*, 353 Or 588, 593-94, 302 P3d 417 (2013) (citing *Holmes*, 311 Or at 406-07 (citations and footnote omitted)).

"What distinguishes a seizure (either a stop or an arrest) from a constitutionally insignificant police-citizen encounter 'is the imposition, either by physical force or through some "show of authority," of some restraint on the individual's liberty.'" *Backstrand*, 354 Or at 399 (quoting *Ashbaugh*, 349 Or at 309). As relevant here, an interaction between a citizen and a law enforcement officer is a seizure for purposes of Article I, section 9,

"only if the officer's conduct would be reasonably perceived as coercive in the sense that it would cause the citizen to reasonably believe that the officer is intentionally restraining the citizen's liberty or freedom of movement in a significant way—that is, in a way that exceeds the bounds of ordinary social encounters between private citizens."

*Id.* at 400.[4] "[P]olice requests for information or cooperation do not implicate Article I, section 9, as long as the officer does no more than seek the individual's cooperation through non-coercive questioning and conduct." *Id.* at 417. The inquiry is fact specific and requires examination of the totality of the circumstances. *Id.* at 399.

Here, the state argues that defendant was not seized because the troopers' conduct did not go beyond "asking a question, requesting information, or seeking [defendant's] cooperation." *Id.* at 403. That is, in the state's view,

---

[4] In *Ashbaugh*, the Supreme Court held:

"A 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution: (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances would believe that (a) above has occurred."

349 Or at 316 (emphasis and footnote omitted). Here, the parties frame the question in terms of part (b) of that test. Accordingly, we do not consider part (a).

in the totality of the circumstances—including social norms in sport fishing—the officers did not engage in any show of authority. Because the state's argument rests in large part on the Supreme Court's discussion in *Backstrand*, we begin by describing that case.

In *Backstrand*, the Supreme Court held that the defendant was not seized during an interaction with Deputy Gerba that took place while the defendant and his girl-friend were shopping in a store that sold adult sexual materials. *Id.* at 394, 417-18. Gerba approached the defendant, asked his age, and asked if he had identification. *Id.* at 395. The defendant gave Gerba his driver's license, and Gerba called dispatch to verify that it was valid. After "having the license[] for a total of 10 to 15 seconds," Gerba returned the defendant's license and left the store. *Id.*

The court explained that a request for identification is "a form of cooperation and involves the kind of information that, as a general proposition, police are free to request." *Id.* at 412. Accordingly, such a request does not amount to a seizure unless "the content of the questions, the manner of asking them, or other actions that police take (along with the circumstances in which they take them) would convey to a reasonable person that the police are exercising their authority to coercively detain the citizen." *Id.* Similarly, the officer's verification of the proffered identification does not, in itself, convey to a reasonable person "that the officer is now exercising his or her authority to coercively restrain the person's liberty or freedom of movement." *Id.*

The defendant in *Backstrand* contended that, in context, Gerba's request—for proof of the defendant's age while he was in an age-restricted store—conveyed that the defendant was under investigation and, accordingly, conveyed that the defendant had to remain and interact with Gerba. *Id.* at 414. The court agreed that the context of the interaction was significant but dismissed the defendant's argument. It explained that the consequence that a reasonable person would expect from a failure to produce proper identification would be ejection from the age-restricted store; that consequence "would not be coercive for purposes of Article I, section 9[,]" because ejection from a place where

a person has no right to remain does not restrict a person's liberty. *Id.* at 415.

It the court's view, an equally important point related to the context of the interaction was that "a reasonable person engaged in an age-restricted activity would expect to be questioned about his or her age, particularly if the person objectively appears close to the minimum age or within an age range where it is customary (as for purchasing alcohol) to request proof of age." *Id.* That was important because, as the court explained, "[p]roof-of-age requests and examinations are customarily made in those settings, by private proprietors of businesses (bartenders, clerks of stores where alcohol or tobacco are sold) as well as by law enforcement personnel." *Id.* Accordingly, "[a]sking a person's age and requesting proof of it is not conduct 'significantly beyond that accepted in ordinary social intercourse' in that setting." *Id.* (quoting *Holmes,* 311 Or at 410). Thus, in context, Gerba's request for the defendant's age and identification did not amount to a show of authority that stopped the defendant.

With that background, we return to the state's arguments in this case. The state contends that, here, defendant was not stopped because the troopers merely asked a question—whether defendant, Anton, and Ene had caught halibut—and then requested information and cooperation by requesting and reviewing defendant's halibut tag. In the state's view, the request to look at defendant's halibut tag was "not out of the ordinary" because anglers expect law enforcement officers to ask them for their tags while they are engaged in highly regulated sport-fishing activities. In support of that argument, the state cites ORS 497.036, which requires the holder of a wildlife license, tag, or permit to "consent to the inspection of any such license, tag or permit" upon request by law enforcement officers.[5] The state also argues that the fact that the troopers were holding onto the boat when they obtained the halibut tags and observed the fish in the cooler is not significant because the troopers held onto the boat only for safety reasons and because it is

---

[5] The state does not argue that defendant consented to the stop.

customary for people in one boat to hold onto another boat while they are talking between boats.

At the outset, we address a factual point that, as we will explain, is significant to our analysis. The state disagrees with the trial court's express findings that Canfield "announced that the troopers would approach to inspect the halibut tags" and that the wording, "we'd like to look at your tags; please get them out for us" is "sufficiently representative of the language" that Canfield used. Rather, the state proposes that Canfield merely requested to see the halibut tags by saying, "can we see your tags?" We reject that proposition because there is evidence in the record sufficient to support the finding that the court made. Accordingly, we are bound by the trial court's finding that Canfield announced that the troopers would inspect the halibut tags—he did not merely request the tags—and he did so by saying something similar to "we'd like to look at your tags; please get them out for us."

Given that clarification of the facts, we disagree with the state's main premise, namely, that the troopers merely requested information and sought defendant's cooperation by asking to look at his halibut tag. Canfield's announcement that the troopers would inspect the halibut tags "had the tone and content of a command." Although it was couched in polite language, Canfield's statement nevertheless conveyed that the troopers were intentionally restraining defendant's liberty to do anything other than submit to a mandatory inspection of the tags.

Reduced to essentials, Canfield's words told defendant, "get out your tag; we are going to inspect it." That is not a request for information or cooperation; it is a command. When an officer's statement would be understood as "a command affirmatively communicating * * * that compliance [is] not optional," it constitutes a show of authority that effects a seizure. *Backstrand*, 354 Or at 408 (describing *State v. Jacobus*, 318 Or 234, 240-41, 864 P2d 861 (1993)); *see also State v. Anderson*, 354 Or 440, 454, 313 P3d 1113 (2013) (when officers' "'requests'" for the defendant to exit a car in which he was sitting were reasonably understood as "directives," the defendant was seized at that point for

purposes of Article I, section 9); *State v. Lange*, 264 Or App 126, 136-37, 329 P3d 797 (2014) (officer's "directive" to the defendant to step out of a bathroom "restrained defendant's liberty of movement by directing him to exit the restroom and effectively announced that defendant was not at liberty to go about his business and remain inside").

Given that state of affairs, the troopers' exercise of their authority to restrain defendant's liberty was confirmed by the fact that they held onto the boat. We express no opinion regarding the possible significance of holding onto a boat under other circumstances—for example, if the troopers had approached the boat only to ask how the fishing was going that day—because here, in light of Canfield's announcement that the troopers would inspect the halibut tags, the troopers' grabbing the boat would have been understood as facilitating the announced inspection. Canfield's verbal announcement told defendant that the troopers would conduct an inspection with which he was required to comply, and holding onto the boat was the means by which the troopers conducted that inspection without causing an unnecessary safety risk to everyone involved.

Nevertheless, as noted above, relying on *Backstrand*, the state argues that defendant was not seized because a reasonable angler expects to have his or her tag inspected by law enforcement officers. In the state's view, a reasonable person in the highly regulated environment of sport fishing would not believe that the troopers were intentionally restraining an angler's freedom of movement by checking the angler's halibut tag because, by inference from Canfield's testimony that the occupants of a boat sometimes "kid[] their buddies" about having their tags checked, such checks by law enforcement officers are common in that environment.

As we have explained, in *Backstrand*, it was significant to the Supreme Court's conclusion that the defendant was not seized that "a reasonable person engaged in an age-restricted activity would expect to be questioned about his or her age." 354 Or at 415. In support of that statement, the court noted that "private proprietors of businesses *** as well as *** law enforcement personnel" customarily make proof-of-age requests and inspect identification

in age-restricted settings. *Id.* Consequently, the court reasoned, "[a]sking a person's age and requesting proof of it is not conduct 'significantly beyond that accepted in ordinary social intercourse' in that setting." *Id.* (quoting *Holmes*, 311 Or at 410).

Relying on *Holmes*, the court in *Backstrand* reasoned that only conduct by a law enforcement officer that is significantly more intrusive than ordinary social intercourse conveys a significant restraint on the person's liberty or freedom of movement. *Id.* For the purposes of that reasoning, ordinary social intercourse is social intercourse between private citizens. *See Holmes*, 311 Or at 410 (question is whether "the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred *between two ordinary citizens*" (emphasis added)). Here, while there is evidence that anglers converse between boats, there is no evidence in the record suggesting that an ordinary citizen might approach an angler and, using "the tone * * * of a command," announce that the citizen will inspect the angler's halibut tag. Accordingly, the situation here is not like the situation in *Backstrand*, where ordinary citizens—private proprietors of age-restricted businesses—customarily engage in the same conduct in which the deputy engaged when he approached the defendant to ask how old he was and whether he had identification. *See also Lange*, 264 Or App at 137 (rejecting the state's argument that the fact that the manager of a cafe could have asked a recalcitrant restroom user to leave the restroom meant that an officer had not engaged in a show of authority by identifying himself, banging on the door, and directing the defendant to leave the restroom).

Citing *State v. Gerrish*, 311 Or 506, 815 P2d 1244 (1991), the state further contends that, even if Canfield engaged in a show of authority, that was insufficient to stop defendant because Canfield's purpose was only to request information and cooperation. In *Gerrish*, an officer who was investigating a nearby robbery stopped a driver by flagging him down and directing him to stop. *Id.* at 508-09. The officer intended to speak with the driver "to determine whether [he] witnessed the shooting/robbery, or to possibly find the

perpetrator." *Id.* at 508. Rather than learning about the robbery, however, the officer observed that the driver was intoxicated, and the driver was charged with driving under the influence of intoxicants. *Id.* at 509.

The court held that the officer's actions did not significantly interfere with the defendant's liberty because they were "the only means available to get defendant's attention long enough to request information"—that is, information *about the robbery. Id.* at 513. The court also explained that "the officer was justified in stopping defendant as a potential witness." *Id.* at 512 n 2.

By contrast, as we have explained, here, when Canfield engaged in a show of authority, he did so by announcing that the troopers would inspect defendant's halibut tag. That announcement was not "analogous to 'tapping [a] citizen on the shoulder at the outset to get a citizen's attention,'" *id.* at 513 (quoting *Holmes,* 311 Or at 410) (brackets in *Gerrish*)—that is, it was not a way to get defendant's attention to ask him about a crime that he might have witnessed. Rather than being a prelude to imparting or seeking information from defendant, Canfield's announcement that the troopers would inspect defendant's halibut tag, in itself, conveyed without ambiguity that defendant had to remain where he was while the troopers investigated him for a halibut-related crime. Especially in light of the question that immediately preceded the announcement— whether defendant, Anton, and Ene had caught and kept any halibut that day—no other purpose would be served by the inspection of the tag. That differentiates Canfield's conduct from the officer's conduct in *Gerrish* as well as Gerba's request for the defendant's age and identification in *Backstrand.*

Thus, we agree with the trial court that defendant was seized when Canfield announced that the troopers would inspect the men's halibut tags and told them to get their tags out for the inspection.

We turn to whether the seizure was justified under Article I, section 9. The state contends that any seizure of defendant was lawful because it was supported by reasonable suspicion that he had committed a crime by failing to

release the yellow-eye rockfish unharmed. In the state's view, "merely changing the focus of an ongoing criminal investigation"—in this case, changing the focus of the stop of defendant from the release of the yellow-eye rockfish to halibut-related crimes—does not require independent reasonable suspicion of the new crime. The state acknowledges that we have reached the opposite conclusion, *see State v. Klein*, 234 Or App 523, 228 P3d 714 (2010) (where officer developed reasonable suspicion of one crime during a traffic stop, officer could extend the stop by asking about that crime, but could not extend it to ask about another, unrelated crime), but it argues that our conclusion in that regard cannot be reconciled with our own and the Supreme Court's precedent.

The state does not identify or grapple with the reasoning of more recently decided cases in which we have applied the reasoning of *Klein*. *See, e.g., State v. Maciel*, 254 Or App 530, 537, 295 P3d 145 (2013) (given that the officer did not investigate the crime of which he had reasonable suspicion, the officer "was justified in continuing to detain defendant to investigate drug trafficking only if the detention was supported by reasonable suspicion of that crime"); *State v. Kentopp*, 251 Or App 527, 534, 284 P3d 564 (2012) ("[A]n officer's reasonable suspicion about certain crimes *does not justify* the officer's extension of a stop to conduct an investigation of another crime for which the officer does not also have reasonable suspicion." (Emphasis in original.)); *see also State v. Kimmons*, 271 Or App 592, 596, 598-99, 352 P3d 68 (2015) (officers unconstitutionally extended stop for criminal trespass by asking for consent to search the defendant's car for weapons). Moreover, the state does not request that we overrule *Klein* or the later cases. Accordingly, we are bound by those cases.

The state does not contend that the record shows that the events that led to the discovery of the disputed evidence took place during an unavoidable lull in a stop regarding the yellow-eye rockfish. Accordingly, as the trial court concluded, any stop regarding the yellow-eye rockfish was unlawfully extended by Canfield's announcement that the troopers would inspect defendant's halibut tag.

Thus, defendant was seized in violation of Article I, section 9, when Canfield announced that the troopers would inspect the men's halibut tags and told them to get their tags out for inspection. As noted above, before the trial court, defendant contended that the evidence was obtained through exploitation of that unlawful seizure. The trial court agreed. The state did not argue or attempt to show that the evidence was not obtained through exploitation of any preceding illegality. Likewise, on appeal, the state does not raise that issue. Accordingly, the trial court did not err in granting defendant's motion to suppress the evidence.

Affirmed.