Argued and submitted September 28, 2015, reversed and remanded
March 22, 2017

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

EDWARD TYRONE WASHINGTON,
*Defendant-Appellant.*

Multnomah County Circuit Court
130130183; A155550

392 P3d 348

Erica Herb, Deputy Public Defender, argued the cause for appellant. With her on the opening brief was Peter Gartlan, Chief Defender, Office of Public Defense Services. With her on the reply brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section.

Dustin E. Buehler, Assistant Attorney General, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Carson L. Whitehead, Assistant Attorney General.

Before Sercombe, Presiding Judge, and Tookey, Judge, and DeHoog, Judge.*

---
* DeHoog, J., *vice* Nakamoto, J. pro tempore.

## SERCOMBE, P. J.

Defendant appeals a judgment of conviction for unlawful possession of cocaine, ORS 475.884, and unlawful possession of methamphetamine, ORS 475.894. In his sole assignment of error, defendant challenges the trial court's denial of his motion to suppress, contending that the evidence at issue was the product of an unreasonable seizure. The trial court denied defendant's motion because it concluded that the police had reasonable suspicion to stop defendant for second-degree criminal trespass. Defendant argues that the police officers that approached defendant and his companions in the parking lot of a strip club did not have reasonable suspicion to stop him. The state responds that the officers did not stop defendant. On review for errors of law, *see State v. Holdorf*, 355 Or 812, 814, 333 P3d 982 (2014), we conclude that the officers lacked reasonable suspicion to stop defendant and that the record is inadequate for us to determine, in the first instance, whether defendant was stopped at the time he was approached by police in the parking lot. We therefore reverse and remand.

"In reviewing a denial of a motion to suppress, we are bound by the trial court's findings of historical fact that are supported by evidence in the record." *Id.* To the extent that the trial court did not make findings of fact, and there are facts that could be decided in more than one way, we presume that the court made factual findings consistent with its ultimate conclusion. *Id.* However, where the trial court has not ruled on an issue, we do not presume that it resolved factual inconsistencies related to that issue. *See Pereida-Alba v. Coursey*, 356 Or 654, 671, 342 P3d 70 (2015) (explaining that "[i]f an implicit factual finding is not necessary to a trial court's ultimate conclusion * * * then the presumption does not apply"). We state the facts in accordance with those standards.

At about 11:30 p.m., members of the Portland Police Bureau's gang enforcement team (GET) were searching for a suspect in an area near two Portland strip clubs—Club 205 and Mystic. That area is known for substantial gang-related criminal activity, including shootings, and there had recently been a gang-related homicide in the parking

lot of Mystic. Officers Billard and Asheim entered Club 205, across the street from Mystic, to search for the suspect, but did not find him there. While at the club, an employee asked Billard and Asheim to check the parking lot for "persons using it for illegal activity or reasons other than club patronage." The parking lot was marked with signs specifying that parking was for club customers only.

While Billard and Asheim were inside Club 205, Sergeant Duilio, the team's supervising officer, drove his unmarked police car slowly through the club's parking lot. Duilio saw three men standing near a car that was backed into a parking space, with a fence directly behind the space. Defendant was standing by the open driver's side door of the car, and the two other men, Lawrence and Harwood, were standing behind the car. Duilio thought that the men were "kind of loitering," because they appeared to be staying in one place without "walking towards or away from the [club], for several minutes." Duilio decided that he would meet up with the other GET officers inside the club and, if the men were still there after he did that, he would go talk to them to make sure that they were patronizing the club and not loitering.

As Duilio was heading toward the club, he encountered Billard and Asheim, who were on their way out. Billard and Asheim told Duilio about the employee's request that they check for people loitering in the parking lot, and Duilio told them about the three men that he had seen standing by the car. The officers believed that they had reasonable suspicion to investigate the men for the crime of criminal trespass, because the men had been in the lot for at least 10 minutes, without appearing to patronize Club 205.

Duilio, Billard, and Asheim were then joined by three other members of the GET, and the six officers "approached the defendant[] from varying vantage points." Most of the officers walked toward defendant, Lawrence, and Harwood "from the front, but at least one officer," Murphy, "approached the men from the left side of the vehicle." However, another officer, Polas, testified that he moved to the right to get a better look at defendant and his companions. Lawrence later testified that he felt "boxed in" and

"surrounded" by the officers. All of the officers were in uniform, and they were directing their flashlights at the men as they walked toward them. The officers testified that they were using their flashlights to illuminate the area, but Lawrence testified that they were shining them in his and the other men's eyes.

As the officers approached, defendant was standing by the driver's side door, and Lawrence and Harwood were standing behind the trunk of the car, which was open. When defendant saw the officers, he walked around to the back of the car and joined the other two men behind the open trunk. The open trunk blocked the officers' view below the men's upper chests. However, Polas saw a gang tattoo on defendant's neck that read "EBK." Polas knew from his experience with the GET that that tattoo stood for "everybody killer" and that it signified defendant's willingness to kill members of any rival gang.

Duilio called out to the men in a "loud enough voice" so that "everybody could hear," identifying himself and his team as police officers and asking the men what was going on. The men did not respond to Duilio's initial question, and he repeated it several times in a "louder" voice to no avail. Defendant and his companions then started to rummage in the trunk of the car, appearing to pass something back and forth to one another, while looking from side to side. The officers were alarmed because they could not see what defendant and the other men were doing with their hands, but their movements were consistent with loading a weapon. They also found it suspicious that the men completely ignored Duilio's questions, because, in their experience, very few people completely ignore a question from a police officer.

The officers then ordered defendant, Lawrence, and Harwood to come out from behind the car and show their hands. The men did not immediately comply, and the officers repeated the order several times. Defendant was the first to come forward, followed by Lawrence, but neither abided by the order to keep their hands visible. Defendant allowed his hands to disappear into the sleeves of his large coat several times as he walked forward, and Lawrence moved his

hands in and out of his pockets. The officers were concerned that those movements might have been "indexing" behavior, unconsciously checking a weapon to make sure that it was still present and was not visible.

Asheim and Duilio asked for and received Lawrence's consent to conduct a patdown search. During the search, Asheim discovered a loaded semiautomatic handgun in Lawrence's right front pocket. Asheim called out that Lawrence had a gun, and Polas and another officer, Dale, who were conducting a patdown search of defendant, decided to put defendant in handcuffs to complete the search, concerned that he might also be armed. During the search, Polas discovered a baggie containing methamphetamine and cocaine on the ground next to defendant's feet. Polas believed that the drugs fell out of defendant's clothing during the search.

Defendant was subsequently charged with one count of unlawful possession of cocaine and one count of unlawful possession of methamphetamine. Defendant moved to suppress the evidence discovered in the patdown search, arguing that he was unlawfully seized without reasonable suspicion when the six officers approached him and the other men in the parking lot and that the evidence obtained from that unlawful seizure should be suppressed. Lawrence, although charged with separate crimes, was charged in the same indictment and filed a motion to suppress raising the same arguments. The court heard defendant's and Lawrence's motions at the same hearing. Following that hearing, at which five of the six officers, as well as defendant and Lawrence, testified, the trial court denied the motion, setting out written findings of fact and conclusions of law.

The trial court did not rule on whether defendant had been seized when the group of police officers first approached him in the parking lot but, instead, concluded that the officers had reasonable suspicion of second-degree criminal trespass at that time.[1] The court explained that

---

[1] Defendant contends that the trial court implicitly concluded that defendant was stopped when it ruled that the police had reasonable suspicion to stop him for trespassing. However, the trial court's written conclusions of law omit any discussion of whether a stop occurred. And, in context, that omission is telling

the police officers "subjectively believed that defendants had committed the crime of Criminal Trespass" and that that belief was objectively reasonable because

"-Lot was marked for customers only.

"-Police were asked by club employees to check lot for loiterers and other non-patrons.

"-Defendants were hanging around their vehicle, with the door and trunk open, for approximately ten minutes.

"-Defendants were not observed as walking towards or away from the business.

"-When contacted by police, defendants walked away from the business, towards the back of their vehicle."

The court then concluded that the patdown search leading to the discovery of the evidence was justified by officer safety concerns.

Defendant then proceeded to a jury trial. The jury found him guilty of possession of cocaine and methamphetamine, and the trial court entered a judgment to that effect. This appeal followed.

On appeal, defendant reiterates his argument that he was seized without reasonable suspicion when the officers approached him and his companions and asked what they were doing. The state does not defend the trial court's ruling on reasonable suspicion. Instead, the state responds that we should affirm the trial court's ruling under the "right for the wrong reason" doctrine, because, according to the state, defendant was not stopped when the police officers first approached him.

We first address defendant's contention that the trial court incorrectly concluded that the officers had reasonable suspicion to stop him for criminal trespass. We assume, like the trial court, that defendant was stopped when the officers approached defendant and his companions as they stood near their car in the parking lot of

because, during oral argument at the suppression hearing, the parties and the court devoted substantial attention to whether a stop had occurred. Therefore, we read the trial court's decision to assume, without deciding, that defendant was stopped.

Club 205. Article I, section 9, of the Oregon Constitution prohibits "unreasonable searches and seizures."[2] Seizures include both stops and arrests. *State v. Backstrand*, 354 Or 392, 399, 313 P3d 1084 (2013). A stop is a "'brief, informal' detention for purposes of on-the-scene investigation" of criminal activity, which involves a "more limited intrusion into a person's liberty than an arrest." *State v. Watson*, 353 Or 768, 775, 305 P3d 94 (2013) (quoting *State v. Cloman*, 254 Or 1, 8-9, 456 P2d 67 (1969)). Further, in contrast to arrests, which require probable cause, stops require only reasonable suspicion that the defendant is engaged in criminal activity. *State v. Martin*, 260 Or App 461, 469, 317 P3d 408 (2014) (citing *State v. Ashbaugh*, 349 Or 297, 309, 244 P3d 360 (2010)).

"Reasonable suspicion of criminal activity exists if [a police] officer subjectively suspects that an individual has committed, or is about to commit, a crime, and that belief is 'objectively reasonable under the totality of the circumstances.'" *State v. Huffman*, 274 Or App 308, 312, 360 P3d 707 (2015), *rev den*, 358 Or 550 (2016) (quoting *State v. Ehly*, 317 Or 66, 79, 854 P2d 421 (1993)). An officer's suspicion is objectively reasonable if the officer is able to "'identify specific and articulable facts that produce reasonable suspicion, based on the officer's experience, that criminal activity is afoot.'" *State v. Sjogren*, 274 Or App 537, 541, 361 P3d 633 (2015) (quoting *State v. Mitchele*, 240 Or App 86, 91, 251 P3d 760 (2010)). The facts giving rise to the officer's suspicion must also be "particularized to the person [stopped] and based on the person's conduct." *Martin*, 260 Or App at 469 (citing *State v. Miglavs*, 337 Or 1, 12, 90 P3d 607 (2004), and *State v. Kingsmith*, 256 Or App 762, 769, 302 P3d 471 (2013)). "'Reasonable suspicion does not require that the articulable facts as observed by the officer *conclusively* indicate illegal activity but, rather, only that those facts support the *reasonable inference* that a person has committed a crime.'" *Sjogren*, 247 Or App at 541 (quoting *State v. Hammonds/ Deshler*, 155 Or App 622, 627, 964 P2d 1094 (1998) (emphases in *Hammonds/Deshler*)).

---

[2] Article I, section 9, provides, in part that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure."

Defendant does not dispute that the officers subjectively believed that he and his companions were guilty of second-degree criminal trespass when the officers approached them in the Club 205 parking lot. Accordingly, the issue is whether, on the basis of specific and articulable facts known to the officers at the time of the stop, it was objectively reasonable to suspect that defendant and his companions were trespassing.

ORS 164.245(1) provides that a "person commits the crime of criminal trespass in the second degree if the person enters or remains unlawfully * * * upon premises." ORS 164.205, in turn, provides the following relevant definitions:

"(3)  'Enter or remain unlawfully' means:

"(a)  To enter or remain in or upon premises when the premises, at the time of such entry or remaining, are not open to the public or when the entrant is not otherwise licensed or privileged to do so;

"* * * * *

"(4)  'Open to the public' means premises which by their physical nature, function, custom, usage, notice or lack thereof or other circumstances at the time would cause a reasonable person to believe that no permission to enter or remain is required."

Here, there is no doubt that the Club 205 parking lot was open to the public at the time that defendant was discovered there by the GET officers. Defendant was in the lot during Club 205's ordinary business hours, when a reasonable person would believe that they did not need permission to enter and remain in the lot for the purpose of patronizing the club. Instead, at issue is whether the officers reasonably believed that defendant was not "licensed or permitted" to be in the lot. Because the club restricted use of the lot to customers, whether the police reasonably believed that defendant was not licensed or permitted to be there depends on whether it was objectively reasonable for them to believe that he was not a customer of the club.

As found by the trial court, the specific and articulable facts known to the officers at the time they encountered defendant were as follows: (1) the Club 205 parking lot was

clearly marked with "for customers only" signs; (2) the GET officers were asked by a club employee to check the parking lot for people committing illegal acts and nonpatrons; (3) defendant and his companions were hanging around their vehicle, with the door and trunk open, for at least 10 minutes; (4) the officers did not see defendant and his companions walk toward or away from the club; (5) when defendant saw the officers approaching him and his companions, defendant walked toward the back of the car, away from the club. Those facts do not provide reasonable suspicion.

First, the signs stating that the parking lot was intended "for customers only" do not add anything to the reasonable suspicion calculus. Those signs help to define what constitutes trespassing at the Club 205 parking lot— *i.e.*, entering or remaining in the lot for purposes other than patronizing the club. But, defining who is and is not a trespasser—*noncustomers* and *customers*—does not tell us anything about whether the police reasonably suspected that *defendant* was a trespasser.

Next, the club employee's request that Asheim and Billard check the parking lot for people loitering or engaging in criminal activity adds little to our analysis. Importantly, the employee's request did not refer to defendant and his companions, and there is no evidence that employee was aware of their presence in the lot. *Cf. State v. Walker*, 277 Or App 397, 402-03, 372 P3d 540, *rev den*, 360 Or 423 (2016) (explaining that an informant's reliable report, including its conclusion, can sometimes be considered in the totality of the circumstances to establish reasonable suspicion). Rather, the employee asked the officers to check for *anyone* who was loitering or engaging in criminal activity, because he knew that people often used the parking lot for unlawful purposes. In effect, the employee's request told the officers that the parking lot was the site of a high level of criminal activity, including trespassing.

That fact is of limited value. Although not irrelevant, the fact that a person is in an area associated with a high level of criminal activity "is insufficient to support an objectively reasonable belief that that person is himself or herself engaged" in criminal activity. *State v. Bertsch*, 251

Or App 128, 134, 284 P3d 502 (2012). Rather, the police must also identify particularized facts about the defendant that support the inference that the defendant's presence at the location is indicative of criminal activity. *See State v. Barber*, 279 Or App 84, 94, 379 P3d 651 (2016) (explaining that the defendant's brief trip to an apartment associated with drug activity was supportive of reasonable suspicion where, "immediately after leaving the apartment that the detectives were monitoring for heroin dealing, defendant and his companion had sat in the car and engaged in what the detectives identified as possible drug activity"). Here, the particularized facts that the officers knew about defendant do not to support that inference.

As discussed above, the officers approached defendant and his companions primarily because they had been in the parking lot for 10 minutes, with the doors and trunk of the car open, and without entering Club 205 or leaving the lot. Defendant's behavior was consistent with that of a trespasser. However, it was also innocuous on its face; Club 205 does not restrict the amount of time that its customers may spend in its parking lot, and defendant's behavior was consistent with a customer lingering in the parking lot before entering or after leaving the club.

Although "[t]he fact that there might be innocent explanations for conduct does not mean that the conduct cannot also give rise to reasonable suspicion of criminality, * * * an officer may not stop a person simply because the person's conduct is consistent with criminal conduct; the nature of the conduct matters." *Martin*, 260 Or App at 469-70 (internal quotation marks omitted). Put another way, an officer must offer something—either by drawing on the officer's training and experience or other specific and articulable facts about the encounter—to show why a defendant's "otherwise innocuous" conduct was, in fact, more suggestive of criminal activity than it appears. *State v. Alvarado*, 257 Or App 612, 631, 307 P3d 540 (2013); *see also Walker*, 277 Or App at 401-02 (explaining that an officer may not stop a person "rely[ing] solely on observing that a person has engaged in a 'not too remarkable action'" (quoting *State v. Valdez*, 277 Or 621, 628, 561 P2d 1006 (1977))).

Here, the officers who testified at the hearing did not offer an adequate explanation as to why they suspected that defendant was a trespasser rather than a customer to demonstrate that there was reasonable suspicion for a stop. They did not draw on their specialized training and experience to explain why they believed that defendant was acting like a trespasser rather than a patron of the club. *See Alvarado*, 257 Or App at 631 (concluding that the officer's "invocation of training and experience, without more elaboration describing what that training and experience consists of, does little to prove that otherwise innocuous facts—carrying a cell phone and a pager, wearing cologne, and having air fresheners—are evidence of criminal activity"). Further, the only other pertinent fact that the court noted, aside from defendant's presence, was that he walked toward the back of the car, away from the club, when he saw the officers approaching him and his companions. However, as the officers approached, they blocked defendant's path to the club's entrance. Thus, the fact that defendant retreated to the back of the car might support an inference that he did not want to talk to the police, but it does not support the inference that he was not a customer of the club. *See Martin*, 260 Or App at 472-73 ("Evidence that a person is in a high-crime area, is engaged in ambiguous conduct, and appears to want to avoid police observation does not give rise to reasonable suspicion to stop the person."). In sum, the specific and articulable facts that the officers relied on were not sufficient, separately or together, to give rise to objectively reasonable suspicion that defendant was trespassing.

As previously noted, the state argues that we should nevertheless affirm the trial court's ruling on the alternative basis that defendant was not stopped when the officers approached him and his companions in the parking lot and Duilio asked them what they were doing. We may affirm a trial court on alternative grounds if certain conditions are met. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (explaining that, under the "right for the wrong reason" doctrine, a court may affirm on an alternative basis not relied on by the trial court if the record is sufficient to support the alternative basis, the trial court's ruling is correct for a reason other than the one

on which the court relied, and the trial court's reasons for its decision were either erroneous or unnecessary in light of the alternative basis). However, here, reaching the state's alternative basis for affirmance would be inappropriate, because the trial court did not resolve the factual issues necessary to determine whether the officers stopped defendant. *See State v. Williams*, 271 Or App 481, 488, 351 P3d 791 (2015) (concluding that, where the trial court concluded only that defendant had not been seized, the record was insufficient to support affirmance based on the state's alternative basis that there was probable cause for a seizure, because "the trial court did not rule on the suppression motion on that ground, and did not make any findings regarding potential [factual] inconsistencies" relevant to the issue); *State v. Silbernagel*, 229 Or App 688, 691-92, 215 P3d 876 (2009) (concluding that it was inappropriate to affirm on defendant's proffered alternative basis for affirmance because the trial court did not address factual issues necessary to resolve that alternative basis).

We begin by briefly reviewing the law related to determining whether the police have stopped a person. Although police-citizen encounters are of "infinite variety," the determination of whether an encounter "implicate[s] the prohibition in Article I, section 9, against unreasonable seizures" depends on which of three defined categories of encounters is implicated. *Backstrand*, 354 Or at 398-99 (internal quotation marks omitted). As the Supreme Court explained:

> "'At one end of the continuum are mere encounters for which no justification is required. At the other end are arrests, which involve protracted custodial restraint and require probable cause. In between are temporary detentions for investigatory purposes, often termed "stops," which generally require reasonable suspicion. Both stops and arrests are seizures for constitutional purposes, while less restrictive encounters are not.'"

*Id.* at 399 (quoting *State v. Fair*, 353 Or 588, 593-94, 302 P3d 417 (2013)). Whether the police have stopped a defendant, or have only engaged in "mere conversation," depends upon whether the officers impose "some restraint on [an] individual's liberty" through "either physical force or through

some 'show of authority[.]'" *Ashbaugh,* 349 Or at 309 (quoting *State v. Rodgers/Kirkeby,* 347 Or 610, 621-22, 227 P3d 695 (2010)). The test to determine whether police conduct amounts to a "show of authority" is "an objective one: Would a reasonable person believe that a law enforcement officer intentionally and significantly restricted, interfered with, or otherwise deprived the individual of his or her liberty or freedom of movement." *Backstrand,* 354 Or at 399 (citing *Ashbaugh,* 349 Or at 316). With that framework in mind, we turn to the unresolved factual issues in the record.

The first unresolved factual issue relates to Duilio's tone of voice when he asked defendant and his companions what they were doing. Among the considerations relevant to determining whether officers have engaged in a show of authority is the "content or manner" of any questions that the officer asked the defendant. *Backstrand,* 354 Or at 403. An officer who speaks in a tone of "command" has more likely engaged in a show of authority than an officer who speaks in a "conversational" tone. *Compare State v. Parker,* 266 Or App 230, 238-39, 337 P3d 936 (2014) (noting that the officer did not "dr[a]w a weapon, raise[] his voice, or otherwise sp[eak] in a manner that was nonconversational" in concluding that defendant was not stopped), *with State v. Paskar,* 271 Or App 826, 836, 352 P3d 1279 (2015) (concluding that defendants were seized in part because the officer's statements had the "tone and content of a command" rather than that of a "request for information or cooperation"). Here, there is no dispute that the content of Duilio's question—"what is going on?"—was indicative of an attempt to engage defendant and his companions in "mere conversation." However, the trial court did not make a clear finding on the *manner* in which Duilio asked that question. The court found that Duilio "called out" to defendant when he asked what was going on, but did not specify his tone. Further, although Billard testified that Duilio spoke to defendant in a "conversational tone," Duilio testified that he first made his request in a "loud enough voice * * * [so that] everybody could hear," and he then repeated that request several times in a "louder" voice.[3] Thus,

---

[3] During oral argument on the motion to suppress, the trial court appeared to accept that Duilio used a "calm" or "mild" tone in asking his question. However, when the court issued its written findings of fact, it did not make a finding on Duilio's tone of voice.

we cannot determine what the trial court would have found about the manner in which Duilio questioned defendant and his companions.

Additionally, there is an unresolved factual issue about how the police officers used their flashlights. If an officer uses a flashlight to block a person's view, and thereby hinders his or her ability to leave an encounter, it could contribute to a conclusion that the officer engaged in a show of authority because a reasonable person might feel that he or she is not free to terminate the encounter. *See State v. Aronson*, 247 Or App 422, 428, 271 P3d 121 (2011), *rev den*, 352 Or 33 (2012) (explaining that the use of a spotlight is not generally indicative of a show of authority, but that it might be if used to block the defendant's view or prevent him from driving away safely). Here, the trial court found only that the officers "directed flashlights at the three men and the area," and made no finding as to whether they shined their lights in the men's eyes. Multiple officers testified that they used their flashlights to illuminate the area because it was dark, but Lawrence testified that the police shined their flashlights in his and the other men's eyes, which impaired their ability to see as the officers approached them. Accordingly, it is not clear what the court would have found had it resolved the factual issues about the officers' use of their flashlights.

Finally, there is an inconsistency in the record about the way that the officers were positioned as they approached defendant and his companions. That inconsistency is significant because, if the officers positioned themselves "in a way that would [have] suggest[ed] to defendant that [he] was surrounded," then the encounter was more likely a stop. *Ashbaugh*, 349 Or at 317. Here, the court found that the GET officers approached defendant and his companions "from varying vantage points" and that, although most of them approached "from the front, * * * at least one officer approached the men from the left side of the vehicle." Some officers testified that all of their number except one—Murphy, who approached from the left side of the car—approached from the front. However, Polas testified that he moved away from the other officers and approached defendant and his companions from the right. Additionally, Lawrence testified that he felt that he was "boxed in" and

"surrounded" by the police. Consequently, factual issues remain pertaining to whether defendant would have felt as if he was surrounded by the officers.

In reviewing a trial court's ruling on a motion to suppress, we generally view the facts in the light most favorable to the trial court's ruling, presuming that the court implicitly resolved any factual disputes consistent with that ruling. Where, as here, the trial court has not made a ruling on a dispositive issue, we cannot apply that presumption, because there is no reason to assume that the court resolved factual issues to reach any particular conclusion on that issue. *See Pereida-Alba*, 356 Or at 671. Accordingly, the record is insufficient to address the state's "right for the wrong reason" argument that defendant was not stopped.

In sum, we conclude that the trial court erred in denying defendant's motion to suppress on the ground that the officers had reasonable suspicion to stop defendant for criminal trespassing. We remand to the trial court to determine whether defendant was stopped when he was initially approached by the police, and to determine the other issues raised by the parties on the motion to suppress.

Reversed and remanded.